**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Phillip Bruce LANG,
Defendant–Appellant.**

**No. 88–6223.**

United States Court of Appeals,
Eleventh Circuit.

June 28, 1990.

---

Phillip Bruce Lange, Marianna, Fla., pro se.

Leonard J. Cooperman, Miami, Fla., for defendant-appellant.

Dexter W. Lehtinen, Linda Collins-Hertz, Lynne Lamprecht, David I. Mellinger, U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and KAUFMAN *, Senior District Judge.

KRAVITCH, Circuit Judge:

Phillip Bruce Lang appeals his conviction on two counts of mail fraud in violation of 18 U.S.C. § 1341 and five counts of interstate transportation of falsely-made securities in violation of 18 U.S.C. § 2314. Lang contends that the district court erred in admitting the grand jury testimony of a government witness under Fed.R.Evid. 804(b)(5), the catchall exception to the hearsay rule. He also claims that the court's jury instructions regarding the mail fraud counts were improper under the Supreme Court's ruling in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

## BACKGROUND

Phillip Lang's ("Phillip" or "appellant") convictions stem from various acts performed in furtherance of a scheme involving fraudulent and worthless checks drawn on banks in California and cashed at banks in Florida. Phillip was employed by his father, Gerald Lang ("Gerald"), who operated a courier service, P.D.Q. Couriers of Florida ("P.D.Q. Couriers"). In April 1981, Phillip called his cousin Sharon Kostich in California and asked her to forward him the information necessary to open a business bank account in California. Kostich obtained forms for opening a business account at the Independence Bank in California, together with a list of documents the bank required. The documents requested by the bank included a copy of the business's articles of incorporation and a signature card.

Phillip mailed the completed forms back to Kostich and she delivered the forms to the Independence Bank. The signature card from P.D.Q. Couriers contained the names "Paul Rose" and "George Silvers." At trial, however, Elaine Friedman, Phillip's former wife, testified that she recognized both of the names on the signature card as being in Phillip's handwriting. The signature card had been notarized by Phillip's father, Gerald Lang.

Independence Bank opened an account for P.D.Q. Couriers and Phillip subsequently endorsed checks drawn on this account by Paul Rose as payor. Phillip deposited these checks in accounts that he had opened in his name at two Miami banks, Southeast Bank and Pan American Bank. Phillip then made substantial withdrawals from the Miami banks against the balances artificially created by the Independence Bank checks, which were ultimately determined to be worthless. Phillip's fingerprints and handwriting appeared on checks deposited in both the Pan American account and the Southeast Bank account. Before Phillip's Pan American and Southeast Bank accounts were closed, the banks sustained losses of $6,166.27 and $7,500 respectively.

Meanwhile, in May 1981, Phillip, again through Sharon Kostich, set up a business account at the Union Bank in California using the same type of fraudulent signature cards. Gerald Lang again appeared as the notary on the signature card. In accordance with his established pattern, Phillip endorsed checks drawn by Paul Rose on P.D.Q. Couriers' account and deposited them in two other Florida banks, South Florida Savings and United National Bank. Before the accounts were closed, South Florida sustained a loss of approximately $9,800 and United National Bank lost $11,759.[1]

The appellant was finally apprehended when he attempted to cash a check at the drive-in window of United National Bank. A bank official invited Phillip inside and alerted the police. When the police officer

---

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. According to Nancy White, a bank official at South Florida Savings, Phillip contacted the bank and promised to reimburse it for the over-drafts from an alleged trust account to which he had access. After a meeting and several telephone conversations during which he repeated this promise, Phillip did not contact South Florida Savings further, and never made any reimbursements.

arrived, appellant stuffed the check he had sought to cash in his mouth and unsuccessfully attempted to eat it.

In August 1985, appellant was indicted on seven counts: Counts I and II alleged mail fraud in violation of 18 U.S.C. § 1341 based on appellant's causing Sharon Kostich to place in the mail the two signature cards which were used in furtherance of the scheme to defraud. Counts III through VII, charging the appellant with the interstate transportation of falsely-made securities, were based on the appellant's role in causing various fraudulent checks to be sent through the mail from Florida to California.

At trial, the appellant's former wife, Elaine Friedman, identified the handwriting on all of the checks as that of the appellant. She further testified that she had lived at Gerald Lang's home during 1981 and that she had never seen any individuals named George Silvers or Paul Rose. Bank officials of both the California and Florida banks testified as to the various transactions involved in the scheme, and Sharon Kostich testified concerning the opening of the accounts. An FBI fingerprint specialist testified that Phillip's fingerprints were found on the documents used to establish the California bank accounts. Another FBI special agent testified that his investigation into the matter had failed to develop any information establishing the existence, or verifying the identities of either Paul Rose or George Silvers. The court also allowed the government to present the grand jury testimony of Gerald Lang, Phillip's father. The substance of that testimony and the circumstances surrounding its admission are discussed below.

The defense case consisted of the testimony of Richard Lang, Phillip's brother,

who testified that the only person at P.D.Q. Couriers who had access to checks and documents was Gerald Lang; that he had never seen Phillip sign any business checks; that he knew that his father had dealt with loan sharks, had financial problems in his business, and had corresponded with the Independence Bank in California. He also identified Paul Rose as someone who had been in the P.D.Q. Couriers' office. Barbara Lang, Richard's wife, also testified that she had worked for P.D.Q. Couriers and had never seen Phillip write any checks.

## ADMISSION OF THE GRAND JURY TESTIMONY

### A. Background

Prior to trial, the government subpoenaed Phillip's father, Gerald Lang, to appear as a witness. Although he agreed to appear, he failed to arrive at court on the first day of trial. Gerald was brought to court the next day under a warrant. At that time, he presented a letter from his physician stating that it would be detrimental to his health to testify. He himself informed the judge that he was recuperating from a massive heart attack, was under medication and medical care, and would not be able to testify. The court, finding that Gerald would be physically unable to undergo the rigors of examination, discharged him, and, over the objections of defense counsel, allowed Gerald's grand jury testimony to be used instead under 804(b)(5).[2]

Counsel for the government read to the jury the transcript of Gerald's testimony given before the grand jury ten months earlier. Gerald had testified that he had been the founder of P.D.Q. Couriers, and that his son Phillip had been in charge of

---

**2.** The Court, after reviewing the transcript of the grand jury testimony, stated that:

> The testimony will be received pursuant to Federal Rule of Evidence 804(b)(5). The court finds that the statement is offered as evidence of a material fact. The statement is more probative on the points for which it's offered. And the general purpose of the rule, the ends of justice will be served by the admissibility of the statement. The Court finds

that ... there do exist exceptional circumstances in the present case which mandate the admissibility of this testimony. And finds upon consideration of all of the facts and circumstances surrounding the taking of this statement, that there is no reason to doubt the trustworthiness of the statement. Further, the court believes that this is the best evidence readily available and hence it will be received.

the financial aspects of the business. He stated that although he himself had not been involved in any transactions involving P.D.Q. Couriers' bank accounts in California, he had frequently notarized documents for his son without paying attention to the content of the papers. He also testified that he had never met any individual named George Rose or George Silvers. Furthermore, he stated that his son "had a knack of being able to sign names" and that he had never discussed with Sharon Kostich anything regarding signature cards used in establishing California bank accounts.

*B. Admissability under Rule 804(b)(5)*

■ The appellant argues that the district court abused its discretion in allowing the government to introduce Gerald's grand jury testimony. The admissibility of hearsay in cases where the declarant is unavailable as a witness is governed by Rule 804(b) of the Federal Rules of Evidence. Parts (b)(1) through (b)(4) of Rule 804 list specific types of hearsay evidence which are admissible as exceptions to the general rule prohibiting the use of hearsay evidence at trial. Under Rule 804, testimony given at a prior trial, statements of a belief of impending death, statements against interest, and statements of personal or family history, are admissible when the declarant is unavailable. This is because "[t]hese categories or information have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify." *United States v. Fernandez*, 892 F.2d 976, 980 (11th Cir. 1989); *see also* Fed.R.Evid. 804 advisory committee's note (hearsay, if of the speci-

fied quality, is preferred over complete loss of the declarant's evidence).

Rule 804(b)(5) is a catchall provision that provides for the admission of statements not specifically covered by the exceptions enumerated in Rule 804(b)(1–4) but "having equivalent circumstantial guarantees of trustworthiness." Such statements are admissible if the court determines that:

(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity *to prepare to* meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 804(b)(5). Appellant does not contend that the district court erred in finding that Gerald Lang was "unavailable." [3] He argues, however, that the admission of this testimony was improper because it lacked sufficient circumstantial guarantees of trustworthiness and because the court failed to hold a hearing to ascertain whether the requirements of Rule 804(b)(5)(B) had been met. [4]

Although some circuits have been fairly flexible in allowing grand jury testimony under Rule 804(b)(5), [5] the Eleventh Circuit

---

**3.** Rule 804(a)(4) states that:
"Unavailability as a witness" includes situations in which the declarant ... is unable to be present or testify at the hearing because of death or then existing physical or mental illness or infirmity.

**4.** Although 804(b)(5) requires that the proponent of a statement admitted under the exception provide sufficient notice to the adverse party in advance of the statement, appellant did not object to the adequacy of notice at the time of trial, nor has he raised the issue on appeal.

**5.** *See, e.g., United States v. Marchini*, 797 F.2d 759, 762–65 (9th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Walker*, 696 F.2d 277, 280–81 (4th Cir.1982), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *United States v. Curro*, 847 F.2d 325, 327 (6th Cir.), *cert. denied*, 488 U.S. 843, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988); *United States v. Guinan*, 836 F.2d 350 (7th Cir.), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988); *United States v. Carlson*, 547 F.2d 1346, 1352–60 (8th Cir.1976),

has been particularly wary of allowing the admission of such testimony as an exception to the hearsay rules. In fact, this circuit, although not adopting a *per se* rule of excluding grand jury testimony, has yet to admit grand jury testimony under the authority of Rule 804(b)(5). *See United States v. Gonzalez*, 559 F.2d 1271, 1274 (5th Cir.1977);[6] *United States v. Thevis*, 665 F.2d 616, 629 (5th Cir. Unit B), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982);[7] *United States v. Fernandez*, 892 F.2d 976, 981–82 (11th Cir. 1989).

The central issue in assessing whether evidence has been properly admitted under Rule 804(b)(5) is whether it possesses sufficient guarantees of trustworthiness. A trial court is only required to consider whether the other requirements of Rule 804(b)(5) have been met if the testimony passes this threshold test.

■ The government asserts that the statements made in grand jury proceedings are particularly trustworthy because they are made under oath and subject to the penalty of perjury.[8] While we implied in *United States v. Chapman*, 866 F.2d 1326, 1331 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989), that an oath may enhance the trustworthiness of testimony, we have made clear that this is not enough to bring it under the Rule 804(b)(5) exception.[9]

In *United States v. Thevis*, we explained: Congress intended evidence to be admitted under 804(b)(5) only if the reliability

of the evidence *equals* or *exceeds* that of the other exceptions of Rule 804(b).... Corroborated grand jury testimony which for one reason or another is unavailable at trial is neither rare nor exceptional.... Grand jury testimony, although given under oath, is not subjected to the vigorous truth testing of cross-examination, as is prior testimony.

665 F.2d 616, 629 (5th Cir. Unit B 1982).

The government argues that the testimony exhibits circumstantial guarantees of trustworthiness because of Gerald Lang's relationship to the appellant and the fact that Gerald Lang testified to matters of first-hand knowledge. The government also stresses that Gerald was apprised of the fact that he was not a target of the investigation. We do not find that these factors significantly increase the trustworthiness of Gerald's grand jury testimony. Family members are no more likely than anyone else to testify truthfully about their activities or those of their relations. Indeed, there is a strong possibility that the rivalries and loyalties inherent in all families may color a family member's testimony. Given this possibility, it is particularly important that the jurors be afforded the opportunity to observe the family member making the statement and that the adverse party be afforded the opportunity to demonstrate a family member's bias. We also note that although Gerald was told that he was not a target of the investigation, he was not granted immunity. His notarization of the signature cards may have put him in fear of being indicted at a later time

---

cert. denied, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

**6.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**7.** The Eleventh Circuit, in *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

**8.** The government also contends that the statement was trustworthy because it was received in a question and answer format and the witness had ample opportunity to explain his answers.

We do not find that these characteristics of grand jury testimony are particularly indicative of its trustworthiness.

**9.** As we noted in *Fernandez*, if an oath alone were sufficient, then the cross-examination requirement under Rule 804(b)(1) would be superfluous. 892 F.2d at 891. We also noted, however, that the lack of cross-examination does not automatically require exclusion of the evidence: "The contrary reading would create an arbitrary distinction between hearsay statements that narrowly, but conclusively fail to satisfy one of the formal exceptions, and those hearsay statements which do not even arguably fit into a mold." *Id.*

for involvement in the scheme and may have led him to exaggerate his son's control over the financial aspects of the business.

[3] The government further argues that the testimony displays circumstantial guarantees of trustworthiness because it is substantially corroborated by other evidence offered by the government. In *Thevis*, however, we pointed out that corroboration alone is not sufficient. *Thevis*, 665 F.2d at 629. Instead, the corroborating evidence must be extraordinarily strong before it will render the hearsay evidence sufficiently trustworthy to justify its admission. Here, although portions of Gerald's testimony were corroborated, we do not find the corroborating evidence sufficiently strong to meet this high standard.

Gerald's testimony that he had little or no contact with Sharon Kostich and had not discussed the bank documents with her was corroborated by Kostich's testimony. His testimony that he had never met George Silvers or Paul Rose was consistent with Elaine Friedman's testimony that she had never met those individuals, though Elaine was not as intimately involved in the business, and it is plausible that she would not know all persons involved in the operation of P.D.Q. Couriers. On the other hand, certain aspects of Gerald's testimony were not corroborated. He alone testified that his son, rather than himself, was responsible for the financial aspects of the business, and only his testimony estab-

lished that he had notarized forms for his son without examining them. Finally, only he testified that his son "had a knack" for signing other people's names.

The trustworthiness of Gerald's testimony is also cast in doubt by representations made to the court by Phillip's attorney concerning Gerald's recantation of some of his grand jury testimony. Gerald allegedly indicated that he had felt extremely hostile towards his son when he testified before the grand jury, and that he had made many statements to the grand jury that were not true.[10] Although the trial judge was apprised of this, he did not comment upon it or in any way indicate that he had considered these representations before admitting the grand jury testimony.[11]

In *Fernandez*, we concluded that "only extraordinarily trustworthy grand-jury testimony could possibly be admissible as truth of the matter asserted ... [w]e certainly could not sanction admission of proffered grand-jury testimony if its trustworthiness and reliability were open to troubling doubt." 892 F.2d at 981–82. The testimony of Gerald Lang does not fulfill these stringent requirements.

Because we find that Gerald's grand jury testimony does not exhibit the circumstantial guarantees of trustworthiness required for admission under Rule 804(b)(5), we need not determine whether the statement fulfilled the additional three criteria of that rule.[12]

---

**10.** The appellant's attorney stated that "he [Gerald] told myself and other members of the family that he basically lied to the Grand Jury."

**11.** The government points us to the Fourth Circuit cases of *United States v. Murphy*, 696 F.2d 282, 284 (4th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *United States v. Walker*, 696 F.2d 277, 281 (4th Cir.1982), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); and *United States v. Garner*, 574 F.2d 1141, 1143 (4th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978) for the proposition that an unavailable witness's grand jury testimony may be admissible although the witness has subsequently called into question the truth of that testimony. We note, however, that the Fourth Circuit has taken a more lenient view of the admissability of grand jury testimony under the residual hearsay exception. *See Garner*, 574 F.2d at 1144.

Allegations casting doubt on the veracity of former testimony do not mandate per se exclusion of that testimony. Such allegations, however, must be taken into account in making Rule 804(b)(5) determinations.

**12.** In addition to circumstantial guarantees of trustworthiness, the statement must be offered as evidence of a material fact, must be more probative on the point for which it is offered than other evidence that the proponent can procure, and must serve the general principles of the rules and the interests of justice.

The appellant argues that, before admitting evidence under Rule 804(b)(5), the trial judge should be required to hold a hearing in order to ascertain whether these three requirements have been fulfilled.

Although the appellant did not request a hearing, he claims that the court should have held

## C. Confrontation Clause Claim

■ Appellant also argues that the admission of the grand jury testimony violates his sixth amendment right to confront the witnesses against him.[13] In *Thevis*, we stated:

Although the Supreme Court explicitly has held that the confrontation clause and the hearsay rule are not coterminous, *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970), the Court recently has stated that it is a "truism" that both provisions protect the same values. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Both the confrontation clause and the hearsay rule seek to balance the need for relevant, probative evidence against the defendant's interest in testing the accuracy of evidence through personal confrontation and cross-examination.

665 F.2d at 632 (footnote omitted). Despite the common root of the confrontation clause and the rules governing hearsay, not all hearsay evidence will violate the confrontation clause. In *United States v. Chapman*, 866 F.2d 1326 (11th Cir.1989), this circuit noted that "in certain circumstances the defendant's right to confrontation must give way to allow the admission of incriminating evidence even though such evidence cannot be cross examined." *Id.* at 1330. We specified, however that two requirements must be met before such evidence will be allowed:

First, the prosecution must show that the out-of-court declarant is unavailable to testify despite its good faith efforts to obtain his presence at trial. Second, the prosecution must show that out-of-court statements bear sufficient indicia of reliability to provide the jury with an adequate basis for evaluating their truth.

*Id.* at 1330 (citing *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980); *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973)). Although the requirement of unavailability is met in this case, the same reasons that led us to find a lack of trustworthiness for purposes of Rule 804(b)(5) convince us that the statement lacks sufficient indicia of reliability to safeguard the appellant's sixth amendment right of confrontation.[14]

## D. Prejudice

■ Although we have found that the district court abused its discretion in admitting the testimony under Rule 804(b)(5) and that the admission resulted in a violation of the appellant's sixth amendment right of confrontation, this does not end our inquiry. We must also examine whether the erroneous admission requires a reversal of appellant's conviction or whether it constituted harmless error.

■ In *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Supreme Court stated that an error is harmless if the prosecution can "prove beyond a reasonable doubt that the constitutional error complained of did not contribute to the verdict obtained." The Supreme Court has made clear that confrontation clause violations are subject to harmless error. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23

one on its own initiative. We decline to require such a hearing to be held as a matter of course. When the opposing party requests such a hearing, however, and when issues relating to the trustworthiness of the testimony are in dispute, we are hard pressed to see a circumstance in which a hearing should not be held. Such a hearing affords the opposing party a full and adequate opportunity to contest the admission of the statement, presents the trial judge with more facts on which to base its ruling, and aids this court in performing its review.

13. The confrontation clause of the sixth amendment provides: "In all criminal prosecutions, the accused shall enjoy ... the right to be confronted by the witnesses against him. U.S. Const. Amend. VI.

14. In *United States v. Chapman*, the court stated that in assessing the reliability of out-of-court statements, a court should consider: corroboration, the out-of-court declarant's personal knowledge of the defendant's identity and role in the crime, the possibility of faulty recollection, and the circumstances under which the statements were made. 866 F.2d at 1330. These factors are similar, though not identical, to those a court must consider in reviewing admission of out-of-court statements under Rule 804(b)(5).

L.Ed.2d 284 (1969). In assessing harmless error in the context of confrontation clause violations,

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (citations omitted).

In the instant case, we conclude that the error was harmless. In reaching this conclusion, we rely not on the fact that Gerald Lang's testimony was duplicative or that it was corroborated by other evidence, but rather on the overall strength of the government's case and the fact that the additional information adduced through Gerald's testimony was not essential to its case.

The appellant argues that the two most prejudicial aspects of Gerald's testimony were his statement that he notarized whatever Phillip gave him without reading it and his statement that Phillip had a knack of signing other people's names. We fail to see how these statements contributed in any significant way to the verdict in this case. Phillip's role in opening the California accounts was established through the testimony of Sharon Kostich and by the fingerprint expert's testimony that Phillip's prints were on the signature cards. In addition, the government demonstrated that Phillip alone benefitted from the checks drawn on those accounts. Gerald's testimony regarding notarization went primarily to the question of whether he notarized the cards with knowledge of their falsity or whether he was an unwitting participant in his son's schemes. His statements did not directly inculpate his son, but rather served to exculpate himself.

Gerald's statement concerning the appellant's ability to forge signatures followed his statement that he could *not* identify whether the signatures on the signature cards had been written by his son. It was followed by the statement, apparently referring to his own notarization, that "I actually couldn't say if they were my signature or if they weren't my signature. They looked like my signature, whatever ones were supposed to have my signature on them." Though the statement regarding appellant's knack for signing other people's names was incriminatory, taken in context, it added little to the government's case against the appellant. The government established that "Paul Rose" and "George Silvers" were fictitious persons through the testimony of Elaine Friedman and the FBI investigator. In addition, Elaine Friedman testified that the "signatures" of these individuals were written in her husband's handwriting.

We have found that the erroneous admission of grand jury testimony constitutes reversible error where "grand-jury hearsay was the flame in the midst of a great deal of smoke," that is, when it constitutes damaging direct evidence against the defendant. *Fernandez*, 892 F.2d 976. Likewise, in *Gonzalez*, "the other evidence which tended to connect defendant with the importation [of marijuana] was slight enough to make [the] grand jury testimony crucial." 559 F.2d at 1272.

In the instant case, Gerald's testimony may have convinced the jury that the appellant's activity in California was conducted without his father's knowledge, but it did not directly inculpate the appellant in the scheme for which he was indicted. Although the majority of the evidence in this case was circumstantial, the testimony of Gerald contributed far less to the government's case than the strong evidence put forth by the government through the testimony of Sharon Kostich, Elaine Friedman, various handwriting and fingerprint ex-

perts, and numerous bank officials. We thus conclude that in the case before us, "the error complained of did not contribute to the verdict obtained," and accordingly, the appellant's conviction must be allowed to stand.[15]

### THE *McNALLY* CLAIM

■ The appellant argues that his convictions for mail fraud are inconsistent with *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) and must be reversed. In *McNally*, the Supreme Court held that 18 U.S.C. § 1341, the mail fraud statute, was intended to reach only schemes involving the deprivation of money or property and does not encompass the fraudulent deprivation of the citizens' intangible right to good government. In its review of pre-*McNally* mail fraud convictions, this circuit has stressed repeatedly that where "a violation of the rights involved would result in depriving another of something of value, and the indictment, the proofs and the instructions are based on that fact" then the convictions for mail fraud will not be reversed on appeal. *United States v. Dynalectric Co.*, 859 F.2d 1559, 1570 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989); *see United States v. Diwan*, 864 F.2d 715, 717 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989); *Lomelo v. United States*, 891 F.2d 1512, 1519 (11th Cir.1990);

The scheme in the instant case, as alleged in the indictment and proved at trial, was one whose ultimate objective was to deprive banks of money through the process of check kiting. The trial court gave no instructions concerning *McNally*-type rights and adequately informed the jury that they were to consider whether a deprivation of property rights had occurred. Thus, we find the appellant's *McNally* claim to be wholly unfounded.

---

**15.** In the case of evidentiary rulings, "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is effected." Fed.R.Evid. 103. Our

For the foregoing reasons, the appellant's conviction is AFFIRMED.

conclusion that the sixth amendment violation resulted in harmless error leads us to conclude that the erroneous evidentiary ruling under Rule 804(b)(5) was harmless as well.