UNITED STATES of America, Appellee,

v.

John Furman WALKER, Appellant.

UNITED STATES of America, Appellee,

v.

Ellis Arnold PHILLIPS, Appellant.

UNITED STATES of America, Appellee,

v.

George Cecil MIXON, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

Billy BASHLOR, Appellant.

Nos. 81–5201 and 81–5220 to 81–5222.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1982.

Decided Nov. 24, 1982.

Rehearing Denied Jan. 3, 1983.

278

Ronald A. Dion, Miami, Fla. (Entin, Schwartz, Angert, Dion & Broudy, P.A., Miami, Fla., on brief), and Randolph Murdaugh, III, Ridgeland, S.C., and David Roberson, Savannah, Ga., for appellants.

Lionel S. Lofton, Asst. U.S.Atty., Charleston, S.C. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, and SPROUSE and CHAPMAN, Circuit Judges.

HAYNSWORTH, Senior Circuit Judge:

Again we are met with the question of admissibility of the grand jury testimony of an unavailable witness under Federal Rule of Evidence 804(b)(5). We conclude that the evidence was properly admitted in this case. All four of the defendants were convicted upon all counts of an indictment charging them with conspiracy to import marijuana, conspiracy to possess it, importation of marijuana and possession with intent to distribute it in violation of 21 U.S.C. §§ 952(a) and 960, 841(a)(1) and 18 U.S.C. § 2.

I.

A shrimp trawler proceeded out of St. Catherine's Sound, Georgia, to a point some 180 miles out at sea where there was a rendezvous with a ship, apparently from Latin America. The trawler took on a cargo of more than 28,000 pounds of marijuana and returned to St. Catherine's Sound. The primary land site was in waters off that Sound, but the trawler, after disembarking three members of its crew in speed boats, diverted to St. Helena Sound in South Carolina.

The next day a Coast Guard cutter found it at anchor some 7.5 nautical miles off Fripp Island, South Carolina. A Coast Guard inspection party went aboard. During a routine inspection, the party noticed the odor of marijuana, and bales of it were seen stacked in the engine room. The trawler had a crew of only two men, "Jimbo" Ward and Willie Parker. They were arrested. Parker was transferred to the cutter, but Ward was held on board with the boarding party, later augmented by Customs and other officials.

In the pilot house of the trawler there was a VHF radio and a citizens band radio tuned to channel 1. Late that afternoon a message was received on CB channel 1 addressed to "Jimbo" and instructing him to "come on in." Anchor was weighed, and the trawler proceeded to and up St. Helena Sound. There was radio communication

with a man who identified himself as "Gator Man" or "Gator Boy," to which Ward responded under the direction of the Chief Petty Officer. Later, there was radio communication, still on CB channel 1, with a small speed boat, which had been sent to meet the trawler and to lead it in. A beam of light was flashed from the small boat permitting the trawler to locate it and come alongside. The two men in the small boat were arrested. Thereafter, radio communication with "Gator Man" was handled by one of the Coast Guardsmen from the small boat's CB radio, because they did not wish the two former occupants of the small boat to overhear what was being said. The Coast Guardsman attempted to imitate Ward's drawl and accent.

An effort was made to get Gator Man to instruct them about where to go, but his response was that the man in the boat would lead them in.

Many months before, Walker, a fisherman and the owner of a farm near Walterboro, South Carolina, contacted the manager of a large plantation on the Combahee River, David Craven, and offered him $50,000 to $100,000 if, on a given night, he would stay at home and not look to see what was occurring on the plantation or any of its several river landings. A little over two months before the events described above, and again only a few days before, there were further conversations between Walker and Craven about the matter. Craven, however, was a special deputy sheriff, and he had reported these contacts to law enforcement officials.

There was testimony by witnesses Thompson and Graves that on the afternoon of August 1, Walker dispatched them in a speed boat, owned by Graves, to meet the trawler and lead it in. They were the two in the small boat that met the trawler at Buoy # 4. They had previously been tried with Ward and Parker but had been acquitted, apparently because the jury was not convinced beyond a reasonable doubt that they knew the nature of the cargo. At the trial of these defendants Graves continued to insist that he did not know of the

marijuana, but Thompson readily admitted his participation from the beginning.

Thompson, a resident of Richmond Hill, Georgia, testified that he had been recruited by Phillips, another resident of that community, to go on the trawler's voyage to take on the marijuana. Others on board were Ward, Parker, Mixon and Bashlor. After the trawler's return to Georgia waters, Thompson disembarked in a small boat. The next day, however, pursuant to instructions given to him earlier by Phillips, he proceeded to Walker's farm near Walterboro, South Carolina. They were met by Graves, a commercial fisherman of Beaufort, South Carolina. Thompson and Graves drove to Beaufort in Graves' truck, and then in Graves' small boat proceeded to Buoy # 4 in St. Helena Sound.

In the first hour of August 2, some fifteen to twenty minutes after midnight, a customs agent discovered Walker in a camper truck equipped with a CB radio set on channel 1 at Fieldspoint Landing. He also had two walkie-talkie instruments, each of which was set on channel A, which the agent testified was the same as CB channel 1. Fieldspoint Landing is a public landing on the plantation managed by Craven. It is equipped with a ramp and restrooms, but there is no dock. It is closer to the mouth of the Combahee River than other landings on that plantation.

Radio transmission to the trawler ceased at approximately 12:15 a.m., about the time of Walker's arrest.

Later, federal and state law enforcement officials came to Craven's house. He, with the county sheriff and a state law enforcement division agent, proceeded to investigate Whiskey Landing, a private landing on the plantation upstream from Fieldspoint. Entry to the private road leading directly to Whiskey Landing was customarily barred by a chain secured by a padlock. When Craven attempted to unlock it, he discovered that the padlock had been changed and they were required to proceed by circuitous means before arriving ultimately at Whiskey Landing. There they discovered three motor homes, a van and several men. Mix-

on, who, according to Thompson's testimony, had been a member of the crew of the trawler on its sea voyage, was arrested, but the six or seven others escaped.

After he and Ward had been tried and convicted, Parker testified before the grand jury. He also lived in Richmond Hill, Georgia, and had been recruited for the venture by Phillips, as had Thompson. The other members of the trawler's crew on the sea voyage were Ward, Mixon, Thompson and Bashlor. On their return to Georgia waters there was contact with two speed boats, one of which was operated by Walker, and Thompson, Mixon and Bashlor were sent ashore. He and Ward, alone in the trawler, then proceeded to the point of their anchorage off Fripp Island where they were arrested.

Before the trial of these four defendants, Parker wrote a letter to the United States Attorney. He stated that he had testified to things before the grand jury that he did not remember and that he had been "scared to death." He stated that he would have said anything to stay out of prison. Though he had been granted immunity for his testimony, however, no one had promised him lighter punishment for it.

At the trial of these defendants, Parker entered a claim of the Fifth Amendment protection against self-incrimination. He stated that he was in fear of prosecution for perjury. The court sustained the claim and declared that Parker was unavailable as a witness. He then admitted so much of Parker's grand jury testimony as tracked Thompson's live testimony. Parker's testimony that he had been recruited by Phillips was left in, but no testimony about anything that transpired after the trawler's contact with two small boats in Georgia was permitted to go before the jury, not

even his identification of Walker as the operator of one of the small boats.

## II.

The district court's admission of only a portion of Parker's grand jury testimony presents some difficulty. Looking at that portion alone one may find few indicia of trustworthiness other than its consistency with Thompson's live testimony.[1] In our previous cases [2] the indicia of trustworthiness were much more than mere consistency with the testimony of some other witness. Moreover, looking only to the admitted portion of Parker's grand jury testimony, admission may have been inappropriate under Federal Rule of Evidence 804(b)(5), which requires that an extra-judicial statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." It seems no more probative than that portion of Thompson's testimony concerning his voyage on the trawler.

If there was error in the admission of this portion of Parker's grand jury testimony, however, it was one that favored the defendants. Looking to all of Parker's grand jury testimony, one discovers very solid indicia of trustworthiness. He testified to the Coast Guard boarding, his arrest and transfer to the Coast Guard cutter. These were known facts and undeniable. He was a member of the crew at the time of the vessel's arrest, and from that there would arise a strong inference that he had been a member of its crew from the beginning of the venture. His recital of the events and circumstances that led to his being there derives color from his verified testimony about the Coast Guard boarding and the arrest. Of course, the trustworthiness of his testimony derives further support from its consistency with that of Thompson, but

1. Of course, there are some other corroborating circumstances. Parker testified that Thompson, Mixon and Bashlor were put ashore in Georgia. It is known that Thompson and Mixon were in South Carolina working in furtherance of the conspiracy the next day, Thompson in the boat that met the trawler, and Mixon, arrested at Whiskey Landing. We do not know

that Bashlor was there, but several unidentified men successfully escaped.

2. *United States v. West,* 574 F.2d 1131 (4th Cir.1978); *United States v. Garner,* 574 F.2d 1141, *cert. denied* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978), and *United States v. Murphy,* 696 F.2d 282 (4th Cir.1982), filed this day.

it rests primarily upon that portion of Parker's testimony that was verified and which is undeniable by these defendants.

Parker's grand jury testimony should have been admitted in its entirety, because its strong indicia of truthfulness meet the requirements of 804(b)(5) and its admission was not a violation of the Confrontation Clause of the Sixth Amendment.

In considering these contentions of the defendants, we think we are entitled to look at Parker's entire grand jury testimony and are not confined to view only that portion that was admitted. The technical requirements of Rule 804(b)(5) and the Confrontation Clause are concerns of the judge and not the jury. We sit to review the judge's rulings and are entitled to consider matters affecting their regularity and appropriateness whether or not they were actually considered by the trial judge. If the excluded portion of Parker's grand jury testimony contained established falsehoods, we would unhesitatingly conclude that they cast doubt upon the whole; when it contains substantiated truths, a reflection of reliability is cast upon the whole.

Any error in the exclusion of a portion of Parker's grand jury testimony was harmless to these defendants. The exclusion of the reference to Walker's presence in the small boat and on the trawler in Georgia can only have helped him; the admission of Parker's testimony about the events of August 1 could only have made the remainder of his testimony more believable.

■ The jury was not without resources in judging Parker's credibility. It could test what Parker said in light of the other evidence. The letter that Parker had written to the United States Attorney stating that he had testified to things he did not remember was before the jury, and there was great emphasis upon that letter in the closing argument of counsel for the defendants. Finally, the grand jury testimony had been presented to it in question and answer form, and the jury could assess for itself the extent to which the questions were suggestive.

### III.

■ Complaint is made of the judge's explanation to the jury of why only a portion of Parker's grand jury testimony was being admitted. It is said that admission of a portion of it would suggest to the jury that the judge believed that portion but disbelieved the remainder. The jury must have known, however, that the excluded portion included Parker's testimony about the boarding and the arrests of August 1, occurrences for which there was conclusive confirmation.

Moreover, there was no objection to the judge's explanation. If the judge should have said anything else to explain to the jury what he was doing, it was incumbent upon defendants to suggest that to him at the time.

### IV.

■ There is no merit in the argument that the evidence was insufficient to convict Phillips. The evidence of his participation in the recruitment process was enough to enable the jury to find that he was a member of the conspiracy and in constructive possession of the marijuana.

■ Nor is there any merit in Walker's contention that he should have been granted a continuance because he was provided with a copy of Craven's grand jury testimony only approximately one week before the trial commenced.

### V.

■ This trial, which was to last over a period of six days, was opened on the first day with a prayer by a minister. It is the practice of the trial judge to have the opening of each trial preceded by a prayer in open court by ministers selected at random among ministers of various faiths and denominations. The minister composes his own prayer.

There is no transcript of the prayer given on the opening day of this trial. Counsel for the defendants say that there was a reference to the shooting of President

Reagan, which had occurred the week before, and to the general lawlessness of society. He requested God's assistance in guiding the jury to do what was right.

After the prayer had been given, defendants objected to it and sought a mistrial. The district judge found nothing in the prayer prejudicial to the defendants, and overruled the motion.

We find nothing prejudicial in the prayer particularly because the jury's deliberation did not begin until six days later. The jurors then would hardly have had the minister's words in mind.

The practice, however, is a needlessly risky one. Because each minister composes his own prayer, its content is beyond the control of the judge. A minister, knowing little of the ground rules for jury trials, may inadvertently say something that is prejudicial to a defendant. We may assume that they are persons of discretion, but a court is not a church, and things that may be said with discretion and appropriateness in a church may be indiscreet or inappropriate in a courtroom.

We think the practice should be discouraged.

Of course, there is nothing in the defendants' contention that the prayer was a violation of their First Amendment rights. Whether it was or was not we do not consider, for they seek only a reversal of the judgments of conviction. They are not entitled to such a reversal unless the content of the prayer substantially impaired the fairness of their trial. That we cannot find.

AFFIRMED.