**Arthur George JOHNSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 95–67.

Supreme Court of Wyoming.

Dec. 16, 1996.

Rehearing Denied Jan. 21, 1997.

Sylvia Lee Hackl, State Public Defender; Deborah Cornia, Appellate Counsel, State Public Defender Program; James N. Wolfe, Cheyenne, for appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Sr. Assistant Attorney General; Barbara L. Boyer, Sr. Assistant Attorney General, Cheyenne, for appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN,* and LEHMAN, JJ.

GOLDEN, Justice.

Appellant, Arthur George Johnson (Johnson), claims the district court erroneously admitted hearsay statements pursuant to

* Chief Justice at time of oral argument.

WYO.R.EVID. 804(b)(3) and 804(b)(6) during his criminal trial. The hearsay statements were made by Ronnie Langley (Langley), a codefendant, during Langley's sentencing hearing, which preceded Johnson's trial. Later, Langley invoked his Fifth Amendment right not to incriminate himself and was unavailable to testify at Johnson's trial.

We affirm.

## ISSUES

Appellant Johnson presents the issues as:

I. Did the trial court err when it allowed the introduction of hearsay non-self-inculpatory statements of Ronnie L. Langley pursuant to Wyoming Rules of Evidence 804(b)(3) and (6)?

II. Did the introduction of hearsay non-self-inculpatory statements of Ronnie L. Langley violate the Wyoming and United States Constitutions?

Appellee State presents only one issue for review:

I. Did the trial court abuse its discretion when it admitted the Langley statement under an exception to the hearsay rule?

## FACTS

Austin BlackCrow (BlackCrow) was fatally beaten and stabbed on March 17, 1994, while an inmate at the Wyoming State Penitentiary. An Information was filed on March 19, 1994, charging Johnson with first degree murder in violation of WYO.STAT. § 6–2–101(a). On October 10, 1994, Johnson made a statement, with his attorney present, which was read into the record during Johnson's trial. In the statement, Johnson did not implicate co-defendant Langley in Black-Crow's death, but admitted to repeatedly stabbing BlackCrow and hitting BlackCrow's head on the cell floor.

On October 21, 1994, Langley, a codefendant in the homicide, pleaded guilty to accessory after the fact. Under oath, Langley provided a factual basis for his plea. Although Johnson's counsel was present in the courtroom when Langley entered his plea, he was not given an opportunity to cross-examine Langley. As part of the agreement for a reduced charge, Langley was to provide the State with a truthful statement about his knowledge of the events of March 17, 1994. On October 24, 1994, Langley gave that statement. Johnson's attorney was given the opportunity to attend the proceeding at which Langley gave the statement, but was unable to attend.

Before Johnson's trial, Langley invoked the Fifth Amendment and refused to testify at Johnson's trial. The district court allowed Langley's October 21, 1994, statement to be read to the jury. The court's decision to admit the statement was based on WYO. R.EVID. 804(b)(3) [1] and (b)(6).[2] Langley's entire statement was as follows:

Q. If you will just explain for the Court from that point forward after Mr. Johnson left this cell, what transpired and if you will just start filling it in.

A. Jeff Johnson left. Art Johnson left and went down the hall. About five minutes later, I seen him enter BlackCrow's cell. I heard fighting going on inside the cell. And when the fighting stopped, I looked in the curtain and saw BlackCrow on top of Art Johnson.

I entered the cell at that point and took BlackCrow off Art Johnson and then I seen BlackCrow had a shank in his hand.

---

1. WYO.R.EVID. 804(b)(3) provides:

 (b) *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ... (3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, ... that a reasonable man in his position would not have made the statement unless he believed it to be true....

2. WYO.R.EVID. 804(b)(6) states, in pertinent part:

 (6) Other Exceptions.—A statement not specifically covered by any of the forgoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure though reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence....

And Art was trying to get it out and finally got it out.

Q. What did you do, if anything, did you grab BlackCrow?

A. Yeah, I grabbed Mr. BlackCrow and pulled him off Art Johnson.

Q. Had you seen the knife before then or after that?

A. After that when I pulled him off, that is when I seen it in his hands.

Q. What did you do at that time?

A. I held him until he got the knife out of his hand. I still had him. I still had him and then he stabbed BlackCrow a couple of times.

Q. He being, you said he stabbed Black-Crow, he being Mr. Johnson?

A. Yes.

Q. Then you let go?

A. Then I let go.

Q. Then what happened?

A. There was still swinging going on. BlackCrow finally gave up, gave up and passed out. Art Johnson rolled him over and banged his head on the floor. He stayed on the floor all the time. He finally got up. They were—they was calling. I looked out and told Johnson we better leave. That is when I left and went to my house.

Q. When you got to your house, what did you do?

A. I noticed blood on my shoes, on my sweats. I tore my sweats off, flushed them and tried to wipe the blood off my shoes.

Q. Did you use a razor blade?

A. Yes.

Q. How did you access the razor blade?

A. Out of a Bic razor.

Q. When you—when you destroyed your clothing, you say you flushed them?

A. Yes.

Q. Did you do it with the intent to prevent the discovery, the detection of prosecution of Mr. Johnson or did you do it to protect—

A. More myself.

On appeal, Johnson objects to the admission of only a part of Langley's hearsay statement. The portion of Langley's statement relevant to this appeal alleged that, during the March 17 fight between Johnson and BlackCrow, BlackCrow "gave up and passed out. Art Johnson rolled him over and banged his head on the floor." A witness at trial testified the head injury killed Black-Crow, although several of the stab wounds were also life-threatening.

The jury found Johnson guilty of second degree murder on November 3, 1994. The district court entered a Judgment and Sentence on January 24, 1995. On appeal Johnson asserts: (1) Langley's statement, Black-Crow "gave up and passed out. Art Johnson rolled him over and banged his head on the floor," was not against Langley's penal interest and should not have been admitted under Wyo.R.Evid. 804(b)(3); (2) the statement did not have sufficient indicia of reliability to be admitted under Wyo.R.Evid. 804(b)(6); and (3) Johnson's Sixth Amendment right to confront Langley was violated by admitting Langley's statement into evidence.

## STANDARD OF REVIEW

"[D]ecisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal." *Tennant v. State*, 786 P.2d 339, 343 (Wyo.1990) (citing *Hopkinson v. State*, 632 P.2d 79, 101 (Wyo.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982)). "Rulings on the admissibility of evidence are committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion. Abuse of discretion occurs when a court's decision, or decision-making process, exceeds the bounds of measured reason in light of those matters properly before that court." *Curl v. State*, 898 P.2d 369, 373 (Wyo.1995) (citations omitted). Hearsay evidence is ordinarily inadmissible; however, it can be received in evidence if it falls within one of the exceptions to the hearsay rule found in the Wyoming Rules of Evidence and it bears sufficient

indicia of reliability to avoid violation of the Confrontation Clause. *Hopkinson,* 632 P.2d at 132. "We will not reverse [a decision admitting hearsay] unless there is clearly no adequate basis in law supporting the trial court's rulings. Thus, if we can conclude that the challenged evidence was properly admissible under any exception to the hearsay rule then we must affirm its admission into evidence." *Hopkinson,* 632 P.2d at 129.

## DISCUSSION

■ Art Johnson complains that inadmissible hearsay evidence was received during his first degree murder trial. When interpreting the Wyoming Rules of Evidence, we recall "[t]he Wyoming Rules of Evidence are based on the policy that conformity to federal practice is more important than uniformity of state practice. Therefore, except as indicated in a 'Committee note' following a rule or subdivision thereof, the Wyoming Rules of Evidence are the federal rules verbatim." Wyo.R.Evid., Committee note. Consequently, United States Supreme Court cases which interpret equivalent federal rules can be persuasive authority to this Court.

*Wyo.R.Evid. 804(b)(3) and "statement"*

■ Johnson asserts the most damaging portion of Langley's statement was that BlackCrow "gave up and passed out. Art Johnson rolled him over and banged his head on the floor." Johnson argues this particular statement was not self-inculpatory and therefore was not inherently reliable in the way intended under Wyo.R.Evid. 804(b)(3). He urges us to follow *Williamson v. United States,* 512 U.S. 594, ——, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994), in which the United States Supreme Court held that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." A factual basis for a plea of guilty on a felony charge clearly falls within the scope of "a broader narrative that is generally self-inculpatory." *Id. See also Munson v. State,* 770 P.2d 1093, 1099 (Wyo. 1989) (Thomas, J., specially concurring).

In *Williamson,* Williamson appealed his conviction for possessing cocaine with intent to distribute, conspiring to possess cocaine with intent to distribute, and traveling interstate to promote the distribution of cocaine. He claimed that the trial court's admission of unsworn statements made by an accomplice, Harris, to a Drug Enforcement Administration agent, Walton, violated Fed.R.Evid. 804(b)(3) and the Confrontation Clause of the Sixth Amendment. The facts framing the legal issue were as follows. A deputy sheriff stopped the rental car driven by Harris for a minor traffic violation. A consensual search of the car uncovered nineteen kilograms of cocaine in luggage in the trunk. The luggage bore the initials of Williamson's sister, the car rental agreement listed Williamson as an additional driver, and in the car's glove compartment were found an envelope addressed to Williamson and a receipt bearing the address of Williamson's girlfriend. The deputy sheriff arrested Harris. Soon, Agent Walton interviewed Harris by telephone. In that interview, Harris claimed that an unidentified Cuban gave him the cocaine, the cocaine belonged to Williamson, and Harris was to deliver the cocaine that night. A few hours later, Agent Walton interviewed Harris in person. In this second interview, Harris said he had rented the car several days earlier and had driven it to meet Williamson. The Cuban, who was Williamson's acquaintance, had given Harris the cocaine and a note telling him how to deliver it. *Williamson,* 512 U.S. at —— – ——, 114 S.Ct. at 2433–34.

Having arranged a controlled delivery of the drugs, Agent Walton was leaving the second interview when Harris told him a different version of Williamson's involvement. Harris said he was transporting the cocaine for Williamson who was traveling in another rental car in front of Harris when the deputy sheriff stopped Harris. When Harris' car stopped, Williamson turned around and drove past the stopped car, seeing Harris' car with its trunk open. Because Williamson had seen the deputy searching the car, a controlled delivery was impossible. Although Harris freely implicated himself, he refused to record his statement and to sign a written statement. *Id.*

At Williamson's trial, Agent Walton testified he had promised to report Harris' cooperation to the Assistant United States Attorney, but had not promised any reward or other benefit to Harris. Although the prosecution gave Harris use immunity and the trial judge ordered Harris to testify, Harris refused. The trial court then ruled that, under FED.R.EVID. 804(b)(3), Agent Walton could testify about what Harris had told him. *Id.* at ——, 114 S.Ct. at 2434.

The trial court found Harris' statement admissible under Rule 804(b)(3), stating:

First, defendant Harris' statements clearly implicated himself, and therefore, are against his penal interest.

Second, defendant Harris, the declarant, is unavailable.

And third, as I found yesterday, there are sufficient corroborating circumstances in this case to ensure the trustworthiness of his testimony. Therefore, under [*United States v. Harrell*, 788 F.2d 1524 (C.A.11 1986) ], these statements by defendant Harris implicating [Williamson] are admissible.

*Id.*

*Williamson* interpreted the scope of the term "statement" in FED.R.EVID. 804(b)(3):

To decide whether Harris' confession is made admissible by Rule 804(b)(3), we must first determine what the Rule means by "statement," which Federal Rule of Evidence 801(a)(1) defines as "an oral or written assertion." One possible meaning "a report or narrative," Webster's Third New International Dictionary 2229, defn. 2(a) (1961), connotes an extended declaration. Under this reading, Harris' entire confession—even if it contains both self-inculpatory and non-self-inculpatory parts—would be admissible so long as in the aggregate the confession sufficiently inculpates him. Another meaning of "statement," "a single declaration or remark," *ibid.*, defn. 2(b), would make Rule 804(b)(3) cover only those declarations or remarks within the confession that are individually self-inculpatory....

Although the text of the Rule does not directly resolve the matter, the principle behind the Rule, so far as it is discernible from the text, points clearly to the narrower reading. Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

*Williamson*, 512 U.S. at —— – ——, 114 S.Ct. at 2434–35.

■■■ We find the Court's analysis in *Williamson* persuasive and therefore hold that "statement" as used in WYO.R.EVID. 804(b)(3) is to be read narrowly. Only statements which are truly self-inculpatory "so far tend[ ] to subject [the declarant] to ... criminal liability, ... that a reasonable man in his position would not have made the statement unless he believed it to be true." WYO. R.EVID. 804(b)(3). "[W]hether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' ... can only be answered in light of all the surrounding circumstances." *Williamson*, 512 U.S. at ——, 114 S.Ct. at 2437. "[T]his can be a fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved." *Id.* In the present case Langley's statement BlackCrow "gave up or passed out. Art Johnson rolled him over and banged his head on the floor" incriminated Johnson, not Langley. Since it did not implicate Langley in any criminal activity, it was not sufficiently against Langley's penal interest to authorize the use of Rule 804(b)(3). The trial court did not discuss whether this particular statement was against Langley's

**364**

penal interest.[3] Apparently, the trial court assumed that a statement made as a factual basis for a felony plea was a statement against interest and therefore admissible in its entirety.

As such, in accordance with our holding and discussion above, we disagree with the trial court's decision that Langley's entire statement providing a factual basis for his guilty plea was admissible under Rule 804(b)(3). If there were no other basis for admitting Langley's statement, we would reverse and remand the case for a "careful examination of all the circumstances surrounding the criminal activity involved," as the United States Supreme Court did in *Williamson*. However, the trial court did not base its decision to admit Langley's statement solely on WYO.R.EVID. 804(b)(3). The trial court determined Langley's statement was admissible under either WYO.R.EVID. 804(b)(3) or (b)(6). In addition, other portions of Langley's statement were against interest and were admissible under WYO. R.EVID. 804(b)(3). We examine the self-inculpatory portions of Langley's statement below.

*The Rest of Langley's Statement under Rule 804(b)(3)*

A "careful examination of all the circumstances surrounding the criminal activity involved" requires us to consider the rest of Langley's statement, Johnson's statement, and the timing of those two statements. Langley's entire statement concerning the fight between BlackCrow and Johnson, which was read to the jury, follows:

Q. If you will just explain for the Court from that point forward after Mr. Johnson left this cell, what transpired and if you will just start filling it in.

A. Jeff Johnson left. Art Johnson left and went down the hall. About five minutes later, I seen him enter BlackCrow's cell. I heard fighting going on inside the cell. And when the fighting stopped, I looked in the curtain and saw BlackCrow on top of Art Johnson.

I entered the cell at that point and took BlackCrow off Art Johnson and then I seen BlackCrow had a shank in his hand. And Art was trying to get it out and finally got it out.

Q. What did you do, if anything, did you grab BlackCrow?

A. Yeah, I grabbed Mr. BlackCrow and pulled him off Art Johnson.

Q. Had you seen the knife before then or after that?

A. After that when I pulled him off, that is when I seen it in his hands.

Q. What did you do at that time?

A. I held him until he got the knife out of his hand. I still had him. I still had him and then he stabbed BlackCrow a couple of times.

Q. He being, you said he stabbed Black-Crow, he being Mr. Johnson?

A. Yes.

Q. Then you let go?

A. Then I let go.

Q. Then what happened?

A. There was still swinging going on. BlackCrow finally gave up, gave up and passed out. Art Johnson rolled him over and banged his head on the floor. He stayed on the floor all the time. He finally got up. They were—they was calling. I looked out and told Johnson we better leave.

That is when I left and went to my house.

Q. When you got to your house, what did you do?

A. I noticed blood on my shoes, on my sweats. I tore my sweats off, flushed them and tried to wipe the blood off my shoes.

Q. Did you use a razor blade?

A. Yes.

Q. How did you access the razor blade?

3. During discussion of Langley's statement, the trial court stated:

I think that particularly the statement made in open court as a factual basis for a Guilty Plea to a Felony meets the requirements of the Wyoming Rules of Evidence under 804, former

testimony. 804(b)(i) [sic] come real close. Maybe doesn't quite cut it there, I don't know.

I think it fits under either number (iii)[sic] (a) Statement against interests or number (vi)[sic], other exceptions.

A. Out of a Bic razor.

Q. When you—when you destroyed your clothing, you say you flushed them?

A. Yes.

Q. Did you do it with the intent to prevent the discovery, the detection of prosecution of Mr. Johnson or did you do it to protect—

A. More myself.

As stated earlier, on appeal, Johnson attacks only the portion of Langley's statement which states BlackCrow "gave up or passed out. Art Johnson rolled him over and banged his head on the floor." Other portions of Langley's statement were indeed against Langley's penal interest and admissible under Rule 804(b)(3). Langley's statement that Johnson took the knife from BlackCrow and stabbed BlackCrow while Langley held him is clearly against Langley's penal interest. The statement also conflicts with Johnson's argument, and the dissent's concern, that Johnson did not get the knife away from BlackCrow until after he smashed BlackCrow's head on the floor.

A closer examination of Johnson's entire statement reveals that Johnson was less than clear about when he actually got the knife from BlackCrow. When first questioned about when he got the knife away from BlackCrow, Johnson said:

Q. Eventually, did you get the knife away from him?

A. Yes, I hit his head on the ground a couple of times while I was holding onto the—his hand with my other hand. And he—I don't remember.

I remember hitting him a couple of times with his head on the ground. And then I had the knife again. So he dropped it. I guess he dropped it when I did that.

The second time Johnson was asked about how he got the knife away from BlackCrow, the following exchange occurred:

A. And I hit his hand on the side of the bed a couple of times and he wouldn't let go of it. And that's when I hit his head.

Q. Describe how that happened, how you—how you were able to hit his head when you—when you had the knife.

A. Well, I, you know, I really—I really don't remember. I just—I remember because he was grabbing my hair and trying to punch me with his free hand while I was holding on trying to use my body to block his other hand and pulling my hair. (Indicating.) And he wouldn't let go of the knife, so I just got pissed off and, you know, grabbed his—grabbed him by his hair and hit him a couple of times.

* * *

Q. Okay. Is that what caused the knife to let go in this is you hitting his head?

A. I can't—I can't say for sure. I don't know.

Q. That's all right.

A. I don't know.

Q. Then what happened once you hit his head on the ground? What did you do? Where was the knife then?

A. Next thing I remember, the knife was in my hand. And I was swinging at him.

Finally, when questioned by his own attorney, Johnson said:

A. Well, at the time I hit his head on the ground, we were both facing down. And I was like kind of had my one arm around him and he had one arm around me. (Indicating.) And I was, you know, just had the knife, or his knife hand, and I don't know. I was just—

Q. You didn't have the knife away from him until after you had—

A. Yeah.

Q. You think it was after you smashed his head on the ground that you got the knife?

A. Yeah. Yeah.

Q. Okay.

▮▮▮▮ We agree with the dissent that the "issue of if and when BlackCrow dropped the knife with which he had threatened and slashed Johnson must be regarded as central to [the] gradation of Johnson's offense." However, the portion of Langley's statement which is against his interest puts the knife in Johnson's hand *before* the combatants wrestled to the floor and Johnson smashed BlackCrow's head on the floor. Therefore, even without the portion of Langley's statement

which was not against his interest, the jury had sufficient evidence before it to determine that Johnson's act was based on rage, not self-defense.

The appellate test for sufficiency of evidence is whether a rational trier of fact could have been sufficiently armed by the evidence to find the essential elements of the offense beyond a reasonable doubt. *Trujillo v. State*, 880 P.2d 575, 578 (Wyo. 1994). In assessing that issue, we view the evidence in a light most favorable to the state, affording them the benefit of all reasonable inferences to be drawn therefrom. *Griffin v. State*, 749 P.2d 246, 248 (Wyo.1988). It is not our task, let alone our place, to reweigh the evidence or reexamine the credibility of the witnesses. *Porth v. State*, 868 P.2d 236, 243 (Wyo. 1994).

*Curl*, 898 P.2d at 375. When faced with the above versions of the fatal event, a rational jury could accept Langley's version of the facts concerning when Johnson got the knife from BlackCrow and reject Johnson's muddled and confused versions.

*Wyo. R. Evid. 804(b)(6) and "equivalent circumstantial guarantees of trustworthiness"*

The State attempts to distinguish this case from *Williamson* because the confession in *Williamson* was not under oath, while Langley's statement was under oath. That distinction was not applicable to our Rule 804(b)(3) analysis. A statement can be against penal interest whether or not it is under oath. However, the fact that the statement admitted into evidence was made under oath is applicable to the Rule 804(b)(6) analysis which follows.

Wyo.R.Evid. 804(b)(6) was

created in order to allow the courts additional flexibility in admitting hearsay. [It is] the product of a rebellion against the overly-broad and somewhat archaic and arbitrary hearsay rule. Th[is] exception[ ][is] designed to allow trustworthy hearsay into evidence *but* only when it is both in fact worthy of trust and necessary to effectuate justice.

*Hopkinson*, 632 P.2d at 130 (citations omitted). *Hopkinson* set out all the require-

ments for the Rule 804(b)(6) exception to the inadmissibility of hearsay:

First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness; this may be established either through other corroborating evidence or by considering the motivation and/or behavior pattern of the declarant.

*Hopkinson*, 632 P.2d at 131–32.

Clearly, the first four requirements listed in *Hopkinson* were met in the present case. Langley was unavailable when he invoked the protection afforded by the Fifth Amendment; Johnson had notice and sufficient opportunity to prepare for and contest the admission of the hearsay (in fact, Johnson filed a Motion in Limine on October 28, 1994); the truth of the matter asserted was evidence of a material fact in the case (testimony indicated the head injury was fatal); the statement was more probative than any other evidence which could be procured through reasonable efforts (Langley was the only living witness other than Johnson). However, whether the statement is supported by circumstantial guarantees of trustworthiness requires closer examination of the facts of this case.

In *Hopkinson* we found circumstantial guarantees of trustworthiness when the hearsay statement was corroborated, under oath, remained consistent, was not retracted, was made with candor and absence of motivation to falsify, the declarant's behavior was consistent with telling the truth, and the statement met the constitutional standard of the Confrontation Clause. *Hopkinson*, 632 P.2d at 133–34. *See also In the Matter of GP*, 679 P.2d 976, 1000–01(Wyo.1984). In the present case, those facts which weigh against admissibility of the statement include: 1) Johnson did not have an opportunity to cross-examine Langley; 2) Langley may have been trying

to curry favor with the prosecutor as part of his plea agreement; and 3) Langley's statement could be seen as exculpatory to Langley's criminal liability for the murder of BlackCrow.

On the other hand, several facts provide indicia of reliability: 1) Johnson made his statement on October 10, 1994. Johnson's statement exculpated Langley from the charges against him. Clearly, after the prosecutor and Langley's investigator heard Johnson's version of the story, the State no longer had a case against Langley for first degree murder. Rather, the State's case against Langley was for accessory after the fact. Langley eventually pleaded guilty to accessory after the fact; therefore, the trial court could reasonably conclude that Langley was not currying favor when he pleaded guilty and gave the factual basis for his plea. The charge was reduced because the evidence, including Johnson's statement, pointed to Johnson and not Langley. 2) Langley's statement was made under oath subject to penalty for perjury. 3) Johnson and Langley are friends. 4) Langley did not have an axe to grind with Johnson or any other apparent reason to lie in his statement. 5) Langley's statement was voluntary. The trial court appropriately determined that Langley's guilty plea was knowing and voluntary pursuant to Wyo.R.Crim.P. 11. 6) Langley's statement was corroborated in large part by Johnson's statement, testimony of the medical examiner,[4] and testimony of other penitentiary inmates. 7) Langley's statements did not vary over time and he never recanted his statement. 8) Johnson's attorney was present when the statement was made. *See* discussion in Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 506 at 868–73 (2nd ed. 1994), citing *United States v. Boulahanis*, 677 F.2d 586, 588–89 (7th Cir. 1982) (court properly admitted uncross-examined grand jury testimony describing attacks by defendants on club owner; witness

was sworn and subject to penalty for perjury, and testified voluntarily, without being pressured; he did not have an axe to grind and his testimony was corroborated); *United States v. Doerr*, 886 F.2d 944, 956–57 (7th Cir.1989) (uncross-examined grand jury testimony admitted where witness was under oath subject to penalty of perjury and testified voluntarily without immunity; his testimony was against penal interest, based on personal knowledge, and corroborated by other evidence); *United States v. Donlon*, 909 F.2d 650, 652–54 (1st Cir.1990) (admitted uncross-examined grand jury testimony where witness testified under oath on matters in personal knowledge, never recanted and did not testify under immunity; no evidence that witness was unreliable, no evidence seriously undermined her testimony, and other evidence substantially corroborated significant portions of her testimony); *United States v. Snyder*, 872 F.2d 1351, 1353–57 (7th Cir.1989) (court should consider character for truthfulness, availability of other evidence, whether witness testified voluntarily, his relationship with the defendant and government, his motivation, personal knowledge, whether he ever recanted, and existence of corroborating evidence); *United States v. Walker*, 696 F.2d 277, 280–81 (4th Cir.1982) (there were few indicia of trustworthiness in part of grand jury testimony admitted at trial, other than consistency with live testimony, but all grand jury testimony as whole revealed "solid indicia of trustworthiness," so admitting it would be proper and would not violate confrontation rights; court applied catchall and confrontation clause, so it could examine all the testimony, not just part admitted).

 Determining the trustworthiness of a hearsay statement involves

an evaluation of the corroborating facts which further indicate veracity of the

---

·**4.** The medical examiner testified that

The effect of the head injuries would be either immediate loss of consciousness which would stay permanent or else temporary loss of consciousness, which may improve, but would eventually, after a matter of moments to minutes to maybe half an hour, again result in unconsciousness to a circumstance where a

person might be extremely dazed or stuporous or be staggering or something like that 'till eventually loss of consciousness.

It varies from individual to individual.

The medical examiner's testimony contradicts Johnson's testimony that BlackCrow was still fighting after Johnson hit his head on the floor, while it corroborates Langley's statement.

statement, the circumstances and conditions under which the statement was made, the incentive which the declarant may have had to be truthful or untruthful, and any factors contributing to the reliability of the report as related by the witness. *United States v. Bailey*, 581 F.2d 341 (3d Cir. 1978). Whether a hearsay statement is sufficiently trustworthy is a matter within the sound discretion of the trial court. *State v. Whyde*, 30 Wash.App. 162, 632 P.2d 913 (1981).

*Crozier v. State*, 723 P.2d 42, 48 (Wyo.1986). *See also Engberg v. Meyer*, 820 P.2d 70, 84 (Wyo.1991); *Smith v. State*, 715 P.2d 1164, 1166 (Wyo.1986). The trial court appeared to be making such an evaluation when it admitted the statement Langley made under oath, but refused to admit Langley's October 24, 1994, statement, which was not under oath. Based on the facts in the record, we cannot say that the trial court abused its discretion when it admitted Langley's hearsay statement under WYO.R.EVID. 804(b)(6).

*Confrontation Clause*

In *Hopkinson*, 632 P.2d at 132–33, we held:

> before hearsay becomes admissible, the Confrontation Clause imposes a burden upon the State in addition to those found under Rule 804(b)(6). The prosecutor is required to establish: (1) that the declarant is unavailable to appear at trial; and (2) that there exists sufficient background information concerning the circumstances under which the hearsay statement was made to provide the jury with an adequate basis to evaluate its veracity.

 In the present case the jury was not provided with background information concerning the circumstances under which the statement was made. However, Johnson objected to the introduction of background information for the statement when the prosecutor asked the court if he could lay foundation for the statement. We cannot allow counsel to complain on appeal that a requirement of the Confrontation Clause

has not been met when counsel objected at trial to the introduction of the information which would have satisfied the requirement by providing the jury with an adequate basis to evaluate its veracity. Additionally, during his closing argument Johnson's counsel mentioned the circumstances of Langley's plea agreement providing the jury with background information very favorable to Johnson.[5]

 Finally, we use a harmless error analysis when considering a challenge to admission of evidence based on the Confrontation Clause. *Van Riper v. State*, 882 P.2d 230, 237 (Wyo.1994); *Johnson v. State*, 806 P.2d 1282, 1287 (Wyo.1991). Although the presence of evidence tending to corroborate the truth of the statement is not a substitute for cross-examination of the declarant at trial, hearsay evidence may possess indicia of reliability by virtue of its inherent trustworthiness. *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990). The presence of corroborating evidence can be one factor in determining whether a particular hearsay statement possesses sufficient indicia of reliability, or it may more appropriately indicate that any error in admitting the statement was harmless. *Wright*, 497 U.S. at 823, 110 S.Ct. at 3150–51.

In our discussion of Rule 804(b)(6) and the required guarantees of trustworthiness, we listed several facts which provide inherent indicia of reliability. They include: 1) Johnson and Langley are friends; 2) Langley did not have an axe to grind with Johnson nor did he have any other apparent reason to lie in his statement; 3) Langley's statement was voluntary; and 4) Langley's statements remained consistent over time. "[T]he quintessence of this test was whether the surrounding circumstances provided adequate bases for evaluating the credibility of the declarant and the truthfulness of his testimony." *Hopkinson*, 632 P.2d at 132. The jury was read statements made by Langley and by Johnson. Those statements differed only as to the amount of resistance BlackCrow exhibited when Johnson hit BlackCrow's head on

---

5. Johnson's counsel stated:

 By the way, we were never allowed to do that with Mr. Langley. They made a deal with him.

 They got a statement. We weren't even offered the opportunity to question him.

the floor and when Johnson got the knife away from BlackCrow. The jury was provided with an adequate basis for evaluating Langley's hearsay testimony against Johnson's statement.

WYO.R.APP.P. 9.04 provides: "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." *See also* WYO.R.CRIM.P. 52; *Candelaria v. State*, 895 P.2d 434, 439–40 (Wyo.1995); *Nava v. State*, 904 P.2d 364, 366–67 (Wyo.1995). The record is replete with facts which could lead a reasonable jury to convict Johnson of second degree murder,[6] making error of the trial court, if any, harmless. First, Johnson's own statement admitted he was "pissed off," he stabbed BlackCrow many times, and Langley was standing in the cell watching him when he looked up from hitting BlackCrow's head on the floor. Dr. Allen testified BlackCrow's head injury was the cause of death, Black-Crow had fourteen major stab wounds, five of which were potentially fatal, and forty to fifty additional injuries. A jury can find malice from the use of a deadly weapon in a dangerous and deadly manner and from all the other facts and circumstances. *Doe v. State*, 569 P.2d 1276, 1279 (Wyo.1977); *Leitel v. State*, 579 P.2d 421, 424 (Wyo.1978); *Lovato v. State*, 901 P.2d 1132, 1134 (Wyo.1995). Finally, blood was found in Johnson's cell and several inmates saw a bloody Johnson leave BlackCrow's cell. Based on these facts, a reasonable jury could have convicted Johnson of second degree murder even without Langley's hearsay testimony, making any error by the trial court in admitting that testimony harmless.

## CONCLUSION

The district court should not have admitted the non-self-inculpatory portion of Langley's hearsay statement under WYO.R.EVID. 804(b)(3); however, this error was remedied by properly admitting the statement under WYO.R.EVID. 804(b)(6), because the statement contained equivalent guarantees of trustworthiness. Further, we find any error which the district court may have made in admit-

ting the hearsay statement was harmless because a reasonable jury could have convicted Johnson of second degree murder without the hearsay statement.

Affirmed.

TAYLOR, Chief Justice, dissenting, with whom LEHMAN, Justice, joins.

Unconvinced that Arthur George Johnson's statement, alone, left the jury no choice but to convict for second-degree murder, I cannot ratify denial of Johnson's right to cross-examine his chief accuser. Therefore, I respectfully dissent.

Johnson and Ronnie Langley were the only witnesses to the brutal death of Austin BlackCrow. No one disputes that Johnson was the instrumentality of BlackCrow's demise. However, the issue of if and when BlackCrow dropped the knife with which he had threatened and slashed Johnson must be regarded as central to gradation of Johnson's offense. Without the capacity to cross-examine Langley, Johnson was deprived of the right to confront the only eye witness—a right guaranteed by the Sixth Amendment to the United States Constitution.

Originally charged as a principal, Langley's potential jeopardy was drastically diminished from life imprisonment to a maximum of three years, conditioned upon his implication of Johnson. During Johnson's trial, Langley parlayed this coup by avoiding nettlesome cross-examination through invocation of his Fifth Amendment privilege against self-incrimination. The jury's only extrinsic gauge of Johnson's veracity was the statement made by Langley when he entered his plea.

Johnson's statement, of course, is similarly suspect. It is *his* future, however, which hangs in the balance. Whatever his transgressions, Johnson is due some semblance of constitutional process while Langley, by virtue of his agreement, is assured early release. Why there were but two surviving witnesses to this protracted and violent scene, unfolding inside a maximum security facility, begs the same question posed by

---

6. WYO.STAT. § 6-2-104 (1988) states "[w]hoever purposely and maliciously, but without premedi-

tation, kills any human being is guilty of murder in the second degree."

BlackCrow's possession of a deadly weapon and Johnson's night-long drinking binge.

Assuming the majority's hearsay analysis is valid, it must be remembered that "the values of the Confrontation Clause and the hearsay rule are not identical." *Hopkinson v. State*, 632 P.2d 79, 132 (Wyo.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). Having finessed Johnson's right to confrontation through hearsay analysis, no matter how cautious, the majority violates the distinction articulated in *Hopkinson* and ignores "the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation." *Lee v. Illinois*, 476 U.S. 530, 546, 106 S.Ct. 2056, 2065, 90 L.Ed.2d 514 (1986).

Confrontation is constitutionally enshrined because it sets the stage for that most theatrical of courtroom moments

> "in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Martinez v. State*, 611 P.2d 831, 837 (Wyo. 1980) (*quoting Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895)). On occasion, prior testimony may be admissible, absent cross-examination, but the *sine qua non* for such admissibility is representation of the defendant at the prior proceeding *and* cross-examination actuated by interests remaining essentially unchanged at trial. *Trujillo v. State*, 880 P.2d 575, 581 (Wyo.1994); *see also Cardenas v. State*, 811 P.2d 989, 992–93 (Wyo.1991); *Rodriguez v. State*, 711 P.2d 410, 414 (Wyo.1985); and *Martinez*, 611 P.2d at 837.

In adjudging Johnson unworthy of the right to cross-examine his chief accuser, we commit constitutional error and abandon a carefully crafted series of Wyoming cases stretching back to *Meldrum v. State*, 23 Wyo. 12, 37, 146 P. 596, 600 (1915).

It is difficult to know the darkness of a soul which makes a struggle unto death the necessary consequence of an utterance so apparently inoffensive as "whatever." I cannot and do not write to exonerate Johnson or excuse his conduct. However, corroboration that a knife remained in BlackCrow's hand might well have given the jury pause to reconsider the gradation of Johnson's offense. As Justice Holmes aptly observed: "Detached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 961 (1921).

Whether BlackCrow's knife was uplifted or continued to constitute a threat to Johnson are questions upon which he should have been entitled to the most searching cross-examination of Langley as the only eye witness. Because such cross-examination was denied, I respectfully dissent.

THOMAS, Justice, concurring and dissenting.

I am in complete agreement that Johnson's conviction should be affirmed. The evidence of guilt, even apart from what Langley had to say, is compelling and overwhelming. I also agree that the admission of Langley's statement can be justified under WYO.R.EVID. 804(b)(6). I am not, however, disposed to adopt so readily the views of the Supreme Court of the United States set forth in the majority opinion in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). I am satisfied that Justice Kennedy's approach in his dissent in *Williamson* is more sound.

In following *Williamson*, the majority opinion describes Langley's statement that BlackCrow "gave up or passed out. Art Johnson rolled him over and banged his head on the floor * * *," as incriminating Johnson not Langley. Langley's statement is quoted more completely, however, and I simply am unable to parse that statement as finely as the majority opinion. Langley made the critical statement under oath as part of the factual basis for his plea of guilty to being an accessory after the fact in a homicide case. In order for his plea to be accepted, it was essential that Langley know that a crime had

been committed, and the critical language described in the majority opinion demonstrates that knowledge. I would hold that Langley's statement clearly is a "statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, * * * that a reasonable man in his position would not have made the statement unless he believed it to be true." WYO.R.EVID. 804(b)(3).

Even conceding that this testimony was offered pursuant to an arrangement for a plea of guilty, it still stands as one that subjected Langley to criminal liability. First, it subjected him to liability for the offense for which he was pleading guilty; but second, if the statement were to be determined to be untrue, he was subject to further criminal liability for perjury. While there seems to be an assumption that Langley was home free on the charge of homicide at the time he made the statement, he was not. The court could have refused to accept the plea tendered, and Langley would still have been charged as a principal on the homicide. WYO.STAT. § 6–1–201 (1988). In that context, the entire statement was against Langley's penal interest and properly was admitted into evidence pursuant to WYO.R.EVID. 804(b)(3).

I confess some conceptual difficulty with a conclusion that the statement had sufficient equivalent circumstantial guarantees of trustworthiness so as to be admissible under WYO.R.EVID. 804(b)(6) and, yet, is suspect as a statement against penal interest pursuant to WYO.R.EVID. 804(b)(3). With the equivalent circumstantial guarantees of trustworthiness, Langley's statement must be perceived as true. If true, it certainly served to implicate him in a way that subjected him to criminal liability.

My normal posture is to give credence to opinions of the Supreme Court of the United States addressing interpretations of the rules of evidence. In this instance, however, I perceive the Supreme Court of the United States as having engaged in straining gnats, and I would not follow their lead. Clearly, *Williamson* is distinguishable on its facts. In that case, the informant was simply fur-

nishing information to an investigative agent; made inconsistent statements; and his statement was not under oath. I would limit the thrust of *Williamson* strictly to its facts and would not expand it to encompass statements under oath given to support a factual basis for a plea of guilty.

I would affirm Johnson's conviction by holding Langley's statement was admissible under WYO.R.EVID. 804(b)(3) and 804(b)(6).