**Tony Allen WALKER, Petitioner,**

v.

**Rick JACKSON, Superintendent, and The North Carolina Attorney General, Respondents.**

**No. 2:95CV000690.**

United States District Court, M.D. North Carolina, Greensboro Division.

Sept. 25, 2002.

·James Phillip Griffin, Jr., N.C. Prisoner Legal Services, Inc., Raleigh, NC, for Plaintiff.

Clarence Joe Delforge, III, N.C. Dept. of Justice, Raleigh, NC, for Defendant.

## MEMORANDUM OPINION AND ORDER

TILLEY, District Judge.

Tony Allen Walker was convicted of first degree murder in the shooting death of his girlfriend, Mary Sue Whitaker, in Guilford County Superior Court on October 17, 1990 and received a sentence of life imprisonment. Mr. Walker contended during trial that Ms. Whitaker had grabbed his revolver and shot herself when he told her that he was going to return to his wife. Upon appeal, he argued that the trial judge improperly admitted statements Ms. Whitaker had made to three people in the months prior to her death identifying Mr. Walker as having inflicted physical injuries upon her. The North Carolina Supreme Court, in a four to three opinion, held that the statements were admissible under North Carolina Rule of Evidence 803(3) which allows hearsay when the declarant's state of mind is an issue. Mr. Walker brought this action pursuant to 28 U.S.C. § 2254, challenging his conviction, alleging that the statements had been admitted in violation of the Confrontation Clause of the Sixth Amendment. The Magistrate Judge recommended denying Mr. Walker's motion for summary judgment and granting that of the Respondents on the basis that the state of mind exception to the hearsay rule is deeply rooted and, therefore, the statements were categorically admissible under the Confrontation Clause. Moreover, the Magistrate Judge found that even if the statements were not properly admissible, any error was harmless because the evidence in question "merely duplicate[d] clearly admissible evidence of Walker's abuse of Whitaker."

Since the Magistrate Judge's recommendation, the Supreme Court issued its opinion in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (holding that declarations against penal interest are not so deeply rooted as to be considered categorically reliable under the Confrontation Clause). While the Court did not address a state of mind exception in *Lilly,* it found that the "against penal interest" exception, as applied, was too broad for all statements falling within the exception to be considered reliable without further analysis. Similarly, because courts have identified a broad range of statements as coming within the "state of mind" exception which, like the "against penal interest" exception, is ". . . not generally based on the maxim that statements made without a motive to reflect on the legal consequences of one's statement, and in situations that are exceptionally conducive to veracity, lack the dangers of inaccuracy that typically accompany hearsay." *Id.* at 126, 119 S.Ct. at 1895, *Lilly* casts a shadow upon the continuing vitality of those cases which had held the state of mind exception to be "deeply rooted" in our jurisprudence. However, an examination of the totality of the circumstances surrounding the making of each of the disputed statements in this case shows that most were made under circumstances providing particularized guarantees of trustworthiness and, consequently, were not admitted in violation of the Confrontation Clause. The remainder, as found by the Magistrate Judge in his Recommendation, are largely duplicative of admissible evidence and, therefore, constitute harmless error.

I.

With slight additions, the facts as stated by the Magistrate Judge are as follows: Mr. Walker was charged in 1989 with the first-degree murder of Mary Sue Whitaker. His first trial ended in a mistrial.

In a second trial, the jury returned a verdict of guilty of first-degree murder, and Walker was sentenced to life imprisonment.

The evidence showed that Walker and Whitaker had been romantically involved. Walker's wife knew of the relationship. In January and February 1989, Whitaker began asking Walker to choose between her and his wife, and the couple discussed living together on a trial basis. On the evening of the shooting, Walker and the victim checked into a Motel 6 to spend the night and discuss their relationship. According to Walker, after some discussion, he told the victim he had decided to leave her and go back to his wife. Subsequently, Whitaker was shot with Walker's .38–caliber handgun and died from her wound.

Officer Sandra Jenkins of the Greensboro Police Department responded to a radio call placed at 9:45 p.m. on February 10, 1989 concerning a shooting in Room 229 of the Motel 6 on Greenhaven Drive in Greensboro. As she arrived at the motel, Officer Jenkins saw Walker standing on the balcony in front of Room 229. As Jenkins approached, Walker said, "She's dead. She shot herself." Jenkins asked what happened and Walker told her he and his girlfriend had gotten into an argument and she had picked up his gun and shot herself. On entering the room, Jenkins saw the victim lying on her stomach with her left arm outstretched, the right side of her head up, and her face covered with blood. A large puddle of blood was beside the victim's head. A .38–caliber gun was on the floor at the right side of the victim, near her feet. Whitaker was still breathing.

Greensboro Police Detective Ed Hill testified that in the motel room he saw a holster in a chair and noted that it was snapped shut. Hill wrote down the following statement as he talked with Walker:

We went to the Motel 6 on 1–85. I registered in Room 229. After we got into the room, we hugged and kissed and I talked—and talked for a while. We discussed that I would go to the liquor store. I left and went to the liquor store, and while I was gone, she took a shower. And then I got back, and she had her nightgown on. She had got some ice while I was gone. We got to talking. I poured one of them little cups full, and that's all we drank out of it. We got to talking. We were discussing some things about each—about seeing each other. We started getting into an argument, and I told her that I wasn't going to argue with her, and that's not what we came there for—came here for. We started talking about Kathy and mine and her relationship, and after tonight, we would let bygones be bygones and be friends when we saw each other. I turned and sat down on the bed, and I heard a click and it was over. I saw the gun in her hand with the barrel to the right side of her head, and she pulled the trigger. There was no way I could stop her. She fell onto the floor and I knelt down and grabbed her and was talking to her and was talking to—talking to her hoping that she could hear me. About that time, the man from the motel called and said there was a complaint about some noise and said to hold it down. I said okay. I then called the police on 911 as soon as the man from the motel hung up. I went back to her, knelt down and hugged her and wanted to hold her. I turned and tried to phone my wife. She wasn't home. Then I called her mom and dad, and her sister answered the phone. I told her to get in touch with my wife and get her up to the motel. Then the police was there. (Tr. pp. 519–520.)

Walker also told Officer Hill that there had been no serious fighting in his relationship with Whitaker and that he had never hit her. He stated that on the night in question he had been fully clothed and was wearing the same clothes during the interview. Later, when Walker undressed at the police station, a large amount of blood was observed on his socks and inside his boots. There was no blood on the outside of his boots, or elsewhere on the outside of his clothing.

Walker's sister-in-law testified that he called her between 9:30 p.m. and 10:00 p.m. looking for his wife, said he might be charged with murder, and asked her to find his wife and tell her to come to the motel.

One spent casing and four live rounds were collected from the gun, which belonged to Walker. There were no identifiable fingerprints on the gun. There was no blood or tissue on the gun.

At trial, prosecution witnesses Charles McCoy and Samuel Kimbrough placed the time of the shooting at between 8:00 and 9:00 p.m. McCoy testified that on February 10, 1989, he was staying in a room below 229 on the first floor of the Motel 6. While watching a television show that aired from 8:00 to 9:00 p.m., McCoy heard loud noises coming from the room above him. He called the desk clerk and asked him to call the people in Room 229 to tell them to be quiet. McCoy testified that just before he called the front desk he heard a noise that sounded like someone "had picked the bed up and dropped it on the ceiling." Kimbrough, the desk clerk, testified that the call came in shortly after 8:30, which was when he began his shift. Kimbrough called room 229 and told the man who answered about the noise complaint. According to Kimbrough, the man who answered agreed to take care of the noise. McCoy stated that the disturbance

had continued up until the time he heard the very loud noise.

The state's evidence was that the call to emergency medical services was received at 9:44 p.m. and the police were dispatched at 9:45 p.m.

An autopsy of the victim revealed that she died from a contact gunshot wound to her right temple. Scorching, abrasions, and gunpowder in the wound indicated that at the moment the gun was fired, its muzzle was in contact with Whitaker's skin. The force of the shot under such circumstances typically causes the scalp around the entrance hole to be blown back and torn, a result that was found here. It is also typical for tissue or blood to be blown back into the muzzle of the gun, but police detectives found an absolute lack of any blood or tissue on or inside the weapon, and concluded that the weapon had probably been wiped clean. The autopsy further indicated that the blood alcohol content of the victim was equivalent to a .17 on the breathalyser scale.

Several of the prosecution's witnesses testified to Walker's previous physical abuse of Whitaker. Randall Vaden, an employee of Terry's Curb Market testified that on February 5, 1989, the Sunday before the shooting, he saw Walker outside the market arguing with the victim and choking her; then Walker stopped and argued more and choked her again. Vaden called the Sheriff's Department; deputies confirmed at trial that they came and intervened, that Ms. Whitaker couldn't talk too well, her face was red, and she was crying; but, she did not want to press charges. The couple left in separate vehicles.

Mary Sue Whitaker's (Sue) sister-in-law and next door neighbor, Bonnie Whitaker (Bonnie), testified that she had seen a cut on Sue's lip and below her nostril and asked her what had happened. Sue asked her not to tell her brother but that Walker

had shoved her into a door casing. Later, Bonnie asked Sue about some bruises on her arm and Sue said Walker had grabbed and shaken her. Sue's first cousin and neighbor, Carl Sidney Amos, testified over Walker's hearsay objection that one time he observed a cut under Sue's nostril, and that her lip was swollen. When he asked Whitaker about it, she said Walker had shoved her into a door. Amos also said, on another occasion, he asked Whitaker about some small marks on her face and bruises on her arm. She confided that Walker had hit her on one occasion and grabbed and shaken her on another, causing those injuries. A friend, Clyde W. Billings, whom the victim had previously dated, testified that Whitaker told him she wished defendant would leave her alone. Billings testified to seeing bruises on her arm and leg, asking her about them, and hearing her reply that Walker had grabbed and kicked her.

Medical records were admitted which showed that the victim had been diagnosed as "chronically dysfunctional," with "depressive neurosis," "suicide ideation" and depression. A psychologist testified that Whitaker suffered from a "borderline personality disorder" and presented a high risk of suicide, having seen her stepfather commit suicide by shooting himself when she was fourteen years old, after she had reported to her mother his physical and sexual abuse of her. A witness testified that he saw Whitaker threaten suicide with a gun and state that she would kill herself rather than have to live without Tony Walker.

## II.

■ The North Carolina Supreme Court's opinion holding the statements of Bonnie Whitaker, Carl Sidney Amos, and Clyde Billings to be admissible under the state of mind exception as recognized in North Carolina did not address the Confrontation Clause question. To be admissible and not violate the Confrontation Clause, a hearsay statement must bear sufficient indicia of reliability either by coming within "a firmly rooted hearsay exception" or having "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597, (1980). While it is arguable after *Lilly* that the exception, as applied, was not firmly rooted in the national jurisprudence [1], an analysis of the statements reveals that most of them contained particularized guarantees of trustworthiness and that the others were, as found by the Magistrate Judge, harmless.

■ "Particularized guarantees of trustworthiness" that render a declarant particularly worthy of belief must be shown from a totality of the circumstances surrounding the making of the statement and may not be bolstered from other evidence showing that the statement may have contained the truth. *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990). In assessing the totality of the circumstances, a court should keep in mind those factors normally considered to be the hazards involved in admitting out of court statements: "[t]he declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener." *Williamson v. United States*, 512 U.S. 594, 598, 114 S.Ct. 2431, 2436, 129 L.Ed.2d 476 (1994)

---

1. In *Barber v. Scully*, 731 F.2d 1073, 1075 (2d Cir.1984) the Second Circuit held the state of mind exception to be firmly rooted for Confrontation Clause analysis. *Accord: see Lenza v. Wyrick*, 665 F.2d 804, 811 (8th Cir.1981) and *Moore v. Reynolds*, 153 F.3d 1086, 1107 (10th Cir.1998).

The cases indicate that the primary inquiry is whether, considering all of the circumstances pertaining to the making of the statement, the declarant had a motive to fabricate. For example, as quoted earlier, the Supreme Court observed in *Lilly*, supra, 527 U.S. at 126, 119 S.Ct. at 1895: "The 'against penal interest' exception to the hearsay rule—unlike previously recognized firmly rooted exceptions—is not generally based on the maxim that statements made without a motive to reflect on the legal consequences of one's statement, and in situations that are exceptionally conducive to veracity, lack the dangers of inaccuracy that typically accompany hearsay." In *Idaho v. Wright*, supra, at 820, 110 S.Ct. at 3149, Justice O'Connor wrote: The basis for the "excited utterance" exception, for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous. (cites omitted). Likewise, the 'dying declaration' and 'medical treatment' exceptions to the hearsay rule are based on the belief that persons making such statements are highly unlikely to lie." And, in *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 742–3, 116 L.Ed.2d 848 (1992), Chief Justice Rehnquist wrote: "A statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom. Similarly, a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony."

One of the problems with allowing the admission of co-defendant or accomplice confessions is that the co-defendant has a motive to fabricate, to shift or share the blame with another or to curry favor with the prosecution. See *Lilly*, supra, 527 U.S. at 133, 119 S.Ct. at 1898, and *Williamson*, supra, 512 U.S. 594, 605, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). When the accomplice statement has been made, not as a confession, but for the purpose of advancing some objective of an ongoing conspiracy, there is no apparent motive to shift or share the blame nor to curry favor and the assertion is categorically admitted against a co-defendant without the necessity of further Confrontation Clause analysis. See Rule 801(d)(2)(E), *Federal Rules of Evidence, Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

In the present case, an examination of the circumstances in which Mary Sue Whitaker made statements about her injuries to her sister-in-law, Bonnie Whitaker, reveals that, when the statements were made, Sue had no motive to fabricate and that the statements were made under circumstances that provided assurance of their veracity. Sue and Bonnie had known one another for nine or ten years [Tr. 239] and Sue had lived with Bonnie and Don Whitaker (Don)—Sue's brother—for about a month before her death. Sue had lived next door with her father for the year before that and, during that time, Bonnie would see Sue about once a week. [Tr. 241]. In mid-October 1988, while Sue was visiting at Bonnie's house, Bonnie noticed Sue's lip was swollen and that there were stitches under her nostril. She asked Sue what had happened and received the following response:

She said—well, she didn't act like she wanted to talk about it at first, and then she talked to me and, you know, she

would tell me that she just don't want everybody or her brother and them knowing that things are happening to her, and that this had happened to her. And I said, "Well, what happened?" And she said, "Well, me and Tony had gotten into a scuffle, an argument," and she said, "he threw me into a door casing frame."

Q: Did she say where that occurred?

A: Randy and Carol Vaughn's house.

Q: And when she said she didn't want her brother to know, who was she referring to?

A: Don Whitaker.

With regard to this conversation, Sue had no motive to fabricate the statement that the Defendant had thrown her into a door casing during an argument. She had nothing to gain from Bonnie by imparting this information falsely. By asking Bonnie not to mention it to Don, she indicated a desire that neither the information nor the incident be held against the Defendant. There were no attendant issues of liability or other legal consequences. The statement was made privately to a close friend, it was in response to a question, and the answer was not coerced. The substance of the information concerned a recent event, one in which Sue was a direct participant; so, there was no danger of a fading memory, or a lack of opportunity to witness and understand the event. There was little likelihood that her words were misunderstood by the listener who, of course, was fully subject to cross examination. While spontaneity in some circumstances is an indicator of reliability, either following a shocking or startling event or as an indication that the statement is free from improper suggestion by an examiner, it is significant in this context that it was in response to a question from a close friend since it evidences that Sue was not initiating the transmittal of unflattering information about the Defendant.

The second conversation took place a few weeks later, in mid-November, 1988 at Sue's father's home. Bonnie, noticing new bruising on Sue's arm inquired about it. Sue responded that the Defendant "had grabbed her, because they were arguing over—they had had a—had a dispute over something, and that he had grabbed her and he had held her real tight." [Tr. 248, 249].

■ In considering the totality of circumstances surrounding the second conversation, it is necessary again to consider the identity and relationship of the parties, the nature of the conversation and any other factors which would indicate the statement was "made without a motive to reflect on the legal consequences of one's statement, and in [a] situation[ ] that [is] exceptionally conducive to veracity, [so that it] lack[s] the dangers of inaccuracy that typically accompany hearsay." *Lilly supra,* 527 U.S. at 126, 119 S.Ct. at 1895—in other words—those "factors [which] relate to whether the [ ] declarant was particularly likely to be telling the truth when the statement was made." *Idaho v. Wright,* supra, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638. Those factors include the family-friendship relationship between Bonnie and Sue, that Sue had nothing to gain by falsely attributing the bruising to the Defendant, that it involved a recent event in which Sue was a participant, that the statement was in response to a question, that it was not coerced, that there were no legal consequences attached to the statement, that Sue had indicated her desire only a few weeks before that similar information not be communicated to her brother, and that, because she was still romantically involved with the Defendant when the second statement was made, had no apparent reason to wish him harm. The statement was neither long nor complex and would not likely

have been subject to being misunderstood by Bonnie. Those factors provide guarantees of trustworthiness making it particularly likely that Sue was telling the truth when she said the Defendant had grabbed and held her arm so tightly during an argument that it left the bruises Bonnie asked about.

■ Carl Sidney Amos testified that he was Sue's first cousin and lived about four to five hundred yards from her during the conversations in question. [Tr. 204]. She came by his residence about once a week. [Tr. 207] In the October–November, 1988 time frame, Sue had come by his home and he had noticed swelling and a cut under her nostril. He asked her what had happened and she replied that the Defendant had shoved her into a door at Randy and Carol Vaughan's house. [Tr. 208–9]. About Thanksgiving, he saw marks on her face and asked what had happened. She replied that the Defendant had hit her at a pool hall. [Tr. 210–11]. On Christmas Eve, he saw her coming from her mother's house. It was warm and he could see bruises on her arm. He asked about the bruising and was told that the Defendant had shaken her. [Tr. 212–13].

Each of the statements was made to a person who was related, to a friend Sue saw regularly, and in a context in which an answer would carry no legal consequences. Each was in response to a direct question and none were coerced. A false answer would neither benefit Sue nor would it likely, at the time it was made, harm the Defendant with whom Sue was then engaged in an active relationship. The statements involved recent events in which Sue was a participant and they were not of a type subject to misinterpretation by the listener. The totality of the circumstances surrounding these statements provide sufficient guarantees of reliability to make them particularly believable.

Clyde Billings testified that he met Sue in December, 1988 and that they dated eight or nine times before her death on February 10, 1989. [Tr. 228–29]. Around the middle of January, Sue spoke of the Defendant and said she "wanted him to leave her alone and he wouldn't do it." Sue had some bruises on her arm and her leg and said that, two or three days before, the Defendant had grabbed her by the arm and kicked her in the leg. [Tr. 231–2].

■ The record does not contain detail of how the conversation came about. Unlike Bonnie Whitaker and Clyde Amos who enjoyed a long-term, close relationship with Sue, Mr. Billings had known her for only a few weeks at the time of the conversation. They were dating. While Sue had nothing to gain by making a false statement to Bonnie or Clyde Amos, she was in a position with respect to Mr. Billings in which some people might naturally wish to minimize their relationship with another suitor or, at least, believe their own interests might be better served by creating an image of the other person and of the relationship different from reality. While the statements might have been truthful, it cannot be said they were made under circumstances free from some motive to fabricate or, at least, exaggerate. The statements do not, therefore, contain those particularized guarantees of trustworthiness necessary to support a finding of reliability under the Confrontation Clause. They were not, however, prejudicial. Although Mr. Amos, Bonnie Whitaker, and Mr. Billings did not agree as to the specific time when Sue's arm was bruised, it appears that the statements about bruises on the arm related to the same incident and, since Bonnie and Amos saw Sue weekly and observed and testified to only one set of bruises on her arm, it is unlikely the jury would have attributed a

separate arm injury to Billings' testimony. Billings' remaining assertions are that there was an accompanying leg bruise from a kick and that Sue wanted Walker to leave her alone. The latter was contradicted by Sue's actions and all other testimony about her feelings for Walker. The former, when weighed against the other evidence, was simply not prejudicial. As the Magistrate Judge stated in his Recommendation:

◼ "[E]ven if Petitioner were able to show in this case an error of constitutional dimension, the court would find that error to be harmless because the evidence in question merely duplicates clearly admissible evidence of Walker's abuse of Whitaker. Walker could be entitled to habeas relief only if the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993), citing *Kotteakos v. United States*, 328 U.S. 750, 766, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); see also *Smith v. Dixon*, 14 F.3d 956 (4th Cir.1994), *cert. denied*, 513 U.S. 841, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994). The test for harmlessness on collateral review of a petitioner's conviction is no longer the more stringent *Chapman*[2] harmless-beyond-a-reasonable-doubt standard the Supreme Court applied in habeas corpus cases prior to *Brecht*.

◼ In *Brecht*, the Supreme Court reasoned that granting habeas corpus relief to a petitioner merely because there may be a "reasonable possibility" that a trial error contributed to the verdict would be contrary to the historic purpose of habeas corpus—"to afford relief [only] to those whom society has 'grievously wronged.'" 507 U.S. at 637, 113 S.Ct. at 1721. The granting of habeas corpus relief where there is no actual prejudice

would have a detrimental effect on the finality and sovereignty of state court judgments. The court observed that retrying defendants carries great social costs and is made difficult after long delays by the erosion of memories and dispersion of witnesses. Balancing the costs and benefits of applying a harmless-beyond-a-reasonable-doubt standard, the Court found it proper in light of the history and function of the writ of habeas corpus to apply "a less onerous standard on habeas review of constitutional error." *Id.* Thus, to be entitled to relief, there must be actual prejudice. The standard is whether the error had a substantial and injurious effect or influence on the jury's verdict.

In *O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court expanded upon the *Brecht/Kotteakos* test of harmless error. The Court determined that if a court reviewing a habeas petition finds constitutional error and is in "grave doubt" about whether or not the error is harmless, the court should treat the error as if it had a substantial and injurious influence on the jury. Thus, a habeas petitioner is entitled to relief if the court finds itself in equipoise as to the harmlessness of the error.

◼ A court does not fulfill its role in determining the question of actual prejudice under *Brecht* simply by viewing the erroneously admitted evidence in isolation, without the context of the whole trial. Rather, the court must carefully study *de novo* the entire transcript of proceedings in order to weigh the probable influence of the wrongly admitted evidence.

◼ At trial Randall Vaden testified that on Sunday, February 5, 1989, he was working part-time at Terry's Curb Market. At around 5:30 or 6:00 p.m., he began to hear a car horn blow. He looked outside

---

**2.** Chapman v. California, 386 U.S. 18, 87     S.Ct. 824, 17 L.Ed.2d 705 (1967)

and saw Mary Sue Whitaker sitting behind the driver's seat of a white Ford pickup truck. The truck door on the driver's side was open and Petitioner was standing outside the truck. Petitioner was choking Whitaker. Vaden called the Sheriff's Department and watched Whitaker and Petitioner until the Sheriff's deputy arrived five or ten minutes later. Petitioner was arguing and choking Whitaker. He choked her then he stopped and argued then choked her again. Vaden did not hear what they were arguing about. The Sheriff's deputies spoke with them and the victim and Petitioner left in separate vehicles. (Tr. pp. 270–84.)

Ken Whitesell, with the Guilford County Sheriff's Department, testified that he responded to the call of an assault at Terry's Curb Market. When he arrived, Mary Sue Whitaker and Petitioner were talking. Deputy Whitesell spoke with Whitaker and she was very upset and "couldn't talk too well." She did not want to talk about what had happened. Her face was red and she was crying. She said she did not want to press charges against Petitioner. (Tr. pp. 284–88.)

Randall Vaden's testimony was unequivocal that Petitioner argued violently with Whitaker, choked her, argued with her some more, and choked her again. Thus, evidence tendered by an entirely disinterested witness, Randall Vaden, [as well as that by Bonnie Whitaker and Carl Sidney Amos] showed the jury that Walker had physically abused Whitaker and that she had reason to fear him. The hearsay evidence Walker complains of from [Clyde Billings] is merely duplicative of this strong evidence, and cannot be said to have had a substantial or injurious effect on the jury.

Further, the court does not look at the challenged evidence in isolation, but looks at the full record. Walker emphasizes that there was defense evidence of Mary Sue Whitaker's depression and history of suicide attempt, and opinion testimony of a forensic pathologist that in his opinion the shooting was a suicide and not murder. Walker points to evidence that tends to call into question the time-line of the events in question. Still, viewed objectively, the State's case was strong and included lines of evidence of inconsistencies between Walker's statements to police and the physical evidence, that the weapon had been cleaned after firing, that there was no blood on Walker's clothes although he said he had hugged the victim, that he did not immediately report the shooting and in fact did not even tell the desk clerk of the purported suicide when he called just after the shooting, evidence that his primary concern was for himself, as shown by his call to relatives immediately after the shooting expressing his concern that he might be charged with murder, and evidence that the gun holster was found by officers to be snapped, despite Walker's statement that the victim took the gun from the holster and shot herself. In the face of the full trial record of evidence against the Petitioner and the fact that the hearsay testimony in question merely duplicates other direct and strong evidence of physical abuse of the victim, the court would not find actual prejudice to the Petitioner ..."

III.

Based on these reasons, it is ORDERED that the Respondents' motion for summary judgment [document #7] be GRANTED and that Petitioner's motion for summary judgment [document #12] be DENIED.