2003 WY 42

**Michael W. SARR, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 02–17.

Supreme Court of Wyoming.

March 26, 2003.

Rehearing Granted May 7, 2003.

Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel, Representing Appellant. Argument by Mr. Roden.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Richard Rideout, Special Assistant Attorney General, Representing Appellee. Argument by Mr. Rideout.

Before HILL, C.J., and GOLDEN, LEHMAN, and KITE, JJ; and KALOKATHIS, DJ.

KALOKATHIS, District Judge.

[¶ 1] Appellant, Michael Sarr (Sarr), appeals from a judgment in which he was found guilty of five counts of aggravated assault and ordered to pay restitution.

## ISSUES

[¶ 2] Sarr raises these issues:

I. Whether the trial court abused its discretion by admitting into evidence at trial hearsay statements under W.R.E. 804(b)(6) made by a nontestifying victim, and whether Appellant's rights under the confrontation clause of the Wyoming Constitution and the confrontation clause of the United States Constitution were violated.

II. Whether there was insufficient evidence to convict Appellant due to the fact that the State did not prove every

essential element of the crimes for which Appellant was charged.

III. Whether the district court abused its discretion when it ordered Appellant to pay restitution.

IV. Was Appellant denied his right to a speedy trial pursuant to W.R.Cr.P. 48?

The State presents the issues thus:

I. Whether the district court committed reversible error by admitting into evidence statements made by the victim who dies prior to trial.

II. Whether the State introduced sufficient evidence to convict Appellant.

III. Whether the district court abused its discretion in ordering Appellant to pay restitution.

IV. Whether Appellant was denied his right to a speedy trial.

## FACTS

[¶ 3] On May 24, 2000, Sarr was arrested for misdemeanor domestic violence against Ann Wing. In conjunction with the misdemeanor charge, Undersheriff Pebbles (Pebbles) asked Ms. Wing to provide a statement, but she refused. Sarr pleaded guilty to the misdemeanor charge and was sentenced to jail with a release date of February 2001. Before the release date, Pebbles asked Ms. Barb Rice, who was a friend of Ms. Wing's, to persuade Ms. Wing, to come in for an interview.

[¶ 4] Ms. Wing agreed to talk. She came to the sheriff's office on February 8, 2001 for a taped interview with Pebbles. Present for the interview was Pebbles, the sheriff, Ms. Wing, Ms. Rice, and the victim coordinator.

[¶ 5] During the interview, Ms. Wing gave a horrific account of ongoing abuse. Her account indicated that Sarr's abuse ran the gamut from him forcing her to stand in the corner, to beating her with a "coup stick" so harshly that she had to have back surgery.[1] The next day Pebbles went to the residence and conducted a consensual search for evidence that would corroborate Ms.

Wing's story. He recovered a coup stick, pictures, and a shotgun. He took photographs of the interior of the residence where many of the alleged acts occurred. He also noticed holes in the wall consistent with Ms. Wing's account of Sarr throwing objects at her. In addition to the evidence recovered on February 9, 2001, the sheriff's department had already recovered a 41–caliber pistol, a pistol belt, and a shotgun from the residence in May of 2000. Ms. Wing returned to the sheriff's office for a follow-up interview on February 15, 2001. During that interview, Pebbles asked Ms. Wing to clarify details of her previous statements.

[¶ 6] The interviews, along with the corroborating evidence recovered by law enforcement, led to the State charging Sarr with seven (7) counts of aggravated assault and battery as follows: Count I alleged that on May 6, 2000 Sarr threw Ms. Wing to the ground splitting her jaw and intentionally striking her with a vehicle knocking her to the ground in violation of Wyo. Stat. Ann. § 6–2–502(a)(i)(ii) (LexisNexis 2001), Count II alleged that on May 6, 2000 Sarr grabbed Ms. Wing by the hair and repeatedly bashed her head against a dining room table in violation of Wyo. Stat. Ann. § 6–2–502(a)(i) (LexisNexis 2001), Count III alleged that on May 6, 2000 Sarr beat Ms. Wing with a "coup stick" across her back causing multiple lacerations and bruising in violation of Wyo. Stat. Ann. § 6–2–502(a)(i)(ii) (LexisNexis 2001), Count IV alleged that between January 1, 2000 and May 25, 2000 Sarr beat Ms. Wing with a pistol belt full of 41–caliber shells causing multiple lacerations and bruising in violation of Wyo. Stat. Ann. § 6–2–502(a)(i)(ii) (LexisNexis 2001), Count V alleged that between November 25, 1999 and May 25, 2000 Sarr placed the muzzle of a locked and loaded 41–caliber pistol against Ms. Wing's temple while threatening to kill her in violation of Wyo. Stat. Ann. § 6–2–502(a)(iii) (LexisNexis 2001), Count VI alleged that between November 25, 1999 and May 25, 2000 Sarr pointed the muzzle of a shotgun toward Ms. Wing with his finger on the trigger and threatened to kill her in

---

1. The record shows that the term, "coup stick" refers to a long wooden staff curved at one end and wrapped in snakeskin. It is a symbol of honor in traditional Native American culture.

violation of Wyo. Stat. Ann. § 6–2–502(a)(i)(iii) (LexisNexis), and Count VII alleged that between April 1, 2000 and May 25, 2000 Sarr, while wearing heavy winter boots, kicked Ms. Wing in her left eye causing a laceration in violation of Wyo. Stat. Ann. § 6–2–502(a)(i) (LexisNexis 2001). Count II was eventually dropped for reasons not evident in the record.

[¶ 7] Shortly after the interviews, Ms. Wing drowned in her bathtub. Left without its principal witness, the State proceeded with the case intending to introduce the taped testimony of the interviews. Sarr objected on the grounds that the taped testimony was inadmissible hearsay and that using it violated his Sixth Amendment confrontation clause right.

[¶ 8] On October 1, 2001 the district court held a hearing to determine admissibility. It issued a comprehensive decision letter allowing the taped testimony under the condition that it be "sanitized" by excluding irrelevant information such as statements concerning abuse in other jurisdictions.

[¶ 9] At trial, evidence was presented concerning the circumstances surrounding Ms. Wing's interview. Some of this evidence came in the form of testimony from Pebbles, who testified that Sarr was arrested and pleaded guilty to domestic violence against Ms. Wing in May of 2000. At that time, Pebbles attempted to persuade Ms. Wing to come forward with information concerning Sarr's abuse but found her reluctant to do so. Later, he contacted Ms. Rice and asked her whether or not Ms. Wing would come in and visit with him. Sarr was scheduled to be released in the middle of February unless there was some reason to hold him, and it was at this time that Ms. Rice contacted Ms. Wing and asked her to come in and talk to Pebbles. Ms. Wing came in for an interview immediately prior to Sarr's release date. During this interview, Pebbles was present along with the sheriff, Ms. Rice, and the victim coordinator. During a second interview, only Ms. Rice and Pebbles were present. In addition to Pebbles' testimony, the sanitized tape was played in open court to the jury.

[¶ 10] The only eyewitness to testify was Daniel Bryan, a former employee of Sarr's. His testimony supported Count I, the incident alleging that Sarr ran his vehicle into Ms. Wing.

[¶ 11] After the State presented its case, Sarr rested without introducing any evidence. The jury returned guilty verdicts on five of the six counts. They found Sarr not guilty of Count VII: kicking Ms. Wing in the head while wearing heavy winter boots. The district court sentenced Sarr to 6–10 years on each count to be served consecutively.

## STANDARD OF REVIEW

[¶ 12] Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent a showing of a clear abuse of discretion. *Robinson v. State*, 11 P.3d 361, 367 (Wyo.2000). Moreover, a district court's judgment may be affirmed on any proper grounds supported by the record. *Bird v. Rozier*, 948 P.2d 888, 892 (Wyo.1997). Because the matter at hand involves a mixed question of fact and constitutional law, we independently review the record as suggested by *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

## DISCUSSION

*W.R.E 804(b)(6) and the Confrontation Clause*

[¶ 13] This is one of those rare cases in which the State's entire case, except for Count I, is based upon hearsay statements of an unavailable witness. As such, we are particularly mindful of the unusual difficulty facing us. The principles of law that we apply are embodied in W.R.E. 804(b)(6), U.S. Const. amend. VI (confrontation clause), and art. 1, § 10 of the Wyoming Constitution. For purposes of this appeal, the interpretation of the confrontation clause controls the meaning of art. 1, § 10 of the Wyoming Constitution.

[¶ 14] Rule 804(b)(6) requires that the State provide adequate advance notice of its intent to introduce the hearsay statements at trial and proffer guarantees of its

trustworthiness. Specifically, as noted in *State v. Johnson,* 930 P.2d 358 (Wyo.1996):

> *Hopkinson* set out all the requirements for the Rule 804(b)(6) exception to the inadmissibility of hearsay:
>
>> First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness; this may be established either through other corroborating evidence or by considering the motivation and/or behavior pattern of the declarant.

930 P.2d at 366 (quoting *Hopkinson v. State,* 632 P.2d 79, 131–32 (Wyo.1981)).

[¶ 15] While the analysis under Rule 804(b)(6) encourages resort to corroborating evidence to determine trustworthiness, the requirements of the confrontation clause forbid it.[2] *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Therefore, we must consider separately the admissibility under Rule 804(b)(6) before proceeding to a confrontation clause analysis.

[¶ 16] Our review for Rule 804(b)(6) purposes focuses on the comprehensive analysis provided by the district court. With but one exception we find no abuse of discretion. That exception involves the statement of Ms. Wing concerning the nature of the injury to her back resulting from the coup stick incident. She stated that prior to surgery, an MRI was taken of her back, and it showed that her vertebrae had been chipped and splintered by the coup stick. In regard to these statements, the State carries the burden of demonstrating that the hearsay statement must be more probative than any other evidence that could be procured by reasonable efforts. W.R.E. 804(b)(6). Medical records or expert testimony would be more probative than Ms. Wing's recollection as to her back injuries. The record does not disclose what efforts, if any, were made to procure that type of evidence. Therefore Rule 804(b)(6) was not available to admit those statements.

[¶ 17] In considering the applicability of the Confrontation Clause, we are mindful of the following:

> "First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ..., [omission in original] the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." ... Second, once a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."

*Wright,* 497 U.S. at 814–15, 110 S.Ct. 3139 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)).

[¶ 18] Statements admitted under the residual exception, W.R.E. 804(b)(6), do not fall within a firmly rooted exception to the hearsay rule. *Wright,* 497 U.S. at 817, 110 S.Ct. 3139. Such hearsay, even though presumptively unreliable, "may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'" *Id.* (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531).

[¶ 19] The district court composed a detailed letter addressing the admissibility of the tapes pursuant to W.R.E. 804(b)(6). In that analysis, the indicia of trustworthiness included: corroborating facts, the circum-

---

**2.** The district court understandably might have been influenced to use corroborating evidence in its determination of reliability as *Johnson* suggests. However, such use of corroborating evidence in Confrontation Clause analyses is justified only for the purpose of determining harmless error. *Idaho v. Wright,* 497 U.S. 805, 823, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990).

stances under which the statements were made, and the declarant's incentive in providing the statements. This approach conforms to the requirements of Rule 804(b)(6) but is incompatible with *Wright* because it relies upon corroborating evidence. So we must decide whether to remand or whether a de novo review will suffice. Because the district court holds no better position to judge the trustworthiness of the tapes than we, a de novo review is appropriate.

[¶ 20] What follows focuses upon particular elements apparent in the record with a view to determining whether or not such elements satisfy the demands of the Confrontation Clause. Our approach considers the totality of the circumstances with the understanding that such circumstances provide guidance as to whether or not the statements are trustworthy, but they are not a substitute for cross-examination. We must determine whether, "the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." *Wright*, 497 U.S. at 819, 110 S.Ct. 3139.

[¶ 21] A review of how other jurisdictions have approached this task helps to define the boundary between statements deemed trustworthy and those that are not.

[¶ 22] In cases addressing grand jury testimony, courts have focused upon the declarant's motive to lie. Instances involving a defendant implicating others to exonerate himself have been declared untrustworthy. *United States v. Gomez–Lemos*, 939 F.2d 326 (6th Cir.1991). However, when the declarant is not charged with any crime but is merely a suspect, some courts have come to the opposite conclusion. *See United States v. Papajohn*, 212 F.3d 1112 (8th Cir.2000).

[¶ 23] A recorded statement considered "plausible" by the trial court, but not supported by a scintilla of evidence independent of the statement, lacked indicia of trustworthiness. *State v. Frazier*, 2001 SD 19 ¶ 29, 622 N.W.2d 246, ¶ 29 (S.D.2001). That court did not conduct a de novo review of the tape recording. Rather, it focused upon the fact that the state had failed to meet its burden. *Id.* at ¶¶ 28–29.

[¶ 24] In a case involving a murder charge arising from a domestic abuse situation, *State v. Grube*, 531 N.W.2d 484 (Minn. 1995), found trustworthy the ex parte statements contained in an affidavit supporting a protection order. *See also Walker v. Jackson*, 226 F.Supp.2d 759 (M.D.N.C.2002).

[¶ 25] Michigan identified a variety of factors in aid of a determination of trustworthiness: (1) the spontaneity of the statements, (2) the consistency of the statements, (3) lack of motive to fabricate or lack of bias, (4) the reason the declarant cannot testify, (5) the voluntariness of the statements, (6) personal knowledge of the declarant about the matter on which he or she spoke, (7) to whom the statements were made, and (8) the time frame within which the statements were made. *People v. Lee*, 243 Mich.App. 163, 622 N.W.2d 71, 80 (2000). After applying these factors, the court deemed trustworthy, a statement by an 81–year–old victim of a robbery, who died before trial.

[¶ 26] We have considered the question of trustworthiness for Confrontation Clause purposes on prior occasions. *See, Hopkinson v. State*, 632 P.2d 79 (Wyo.1981),; *State v. Johnson*, 930 P.2d 358 (Wyo.1996),; and *Robinson v. State*, 11 P.3d 361 (Wyo.2000).

[¶ 27] In *Hopkinson* the prosecution introduced statements made by the victim prior to his death. We stated that in order to comply with the requirements of the Confrontation Clause the prosecution must provide sufficient background information concerning the circumstances under which the hearsay statements were made to provide the jury with an adequate basis to evaluate its veracity. In that case, the prosecutor established the history and circumstances surrounding the giving of the statement and provided evidence of the defendant's character. *Hopkinson*, 632 P.2d at 134.

[¶ 28] The issue of trustworthiness arose again in *Johnson*. In that case the prosecution introduced co-defendant statements made during sentencing. We found that the statements were reliable because (1) the declarant and the defendant were friends, (2) the declarant had no apparent reason to lie in his statements, (3) the statements were

voluntary, and (4) the statements were consistent over time. *Johnson,* 930 P.2d at 368.

[¶ 29] Recently, in *Robinson,* we found that hearsay statements were properly admitted under the "against penal interest" exception to the hearsay rule. Without deciding whether the exception was firmly rooted, the statement was deemed trustworthy because (1) the statements implicated the victim in misconduct other than the crime for which the defendant was convicted, (2) the statements did not invoke the confession of an accomplice, and (3) they were not made to shift blame or for some other improper motive such as courting favor with authorities. *Robinson,* 11 P.3d at 371.

[¶ 30] Sarr argues that the Wyoming cases described above require that trustworthiness be determined by reference to the circumstances under which the statement was made and not from the statement itself. In the present case, evidence of surrounding circumstances is slight. However, the totality of the circumstances approach provides a greater degree of flexibility, which allows direct reference to the statement itself for indicia of trustworthiness.

[¶ 31] Turning to the evidence in this case, we note those circumstances that detract from a finding of trustworthiness. The lack of an opportunity to cross-examine is one. The fact that the statement was not under oath is another. The fact that the interview occurred 9–15 months after the events took place weighs against trustworthiness. The need to have Ms. Rice persuade Ms. Wing to come forth is another negative factor. The imminence of Sarr's release evidences a motive to fabricate in order to keep Sarr behind bars. Finally, the fact that Ms. Rice was a friend of Ms. Wing's and was familiar with domestic violence suggests coaching.

[¶ 32] On the other hand, the record is replete with details that support a finding of trustworthiness. As the district court mentioned, Ms. Wing appeared to want the best for Sarr. She was motivated by a desire to see that Sarr received the help he needed for his violent behavior. Her timing in giving the account showed that she feared Sarr because of his violent behavior and wanted him to remain incarcerated, which makes her statements all the more likely to be true. Why else would she fear him? Ms. Wing was not asked leading questions. She formulated her own account in response to questions seeking clarification.

[¶ 33] Despite the fact that Ms. Rice persuaded Ms. Wing to give a statement, Ms. Wing came down to the sheriff's department on her own volition. Her hesitancy in relating events suggests that she thought about the consequences of her statement, which included the obligation to testify at trial. No one expected her to die before trial. She must have known at the time she gave the statements that she might be called upon to testify in front of a jury and come face-to-face with Sarr. Under such circumstances, she would have no motive to lie.

[¶ 34] Furthermore, the tone and tempo of her statements and their spontaneity demonstrate their reliability. She explained the horrors she suffered in a detailed, internally consistent manner. When she did not know the answer, she took pains to clarify the extent to which she partially knew the answer. If a question seeking clarification headed in the wrong direction, she would correct it. When informed of Daniel Bryan's statement that Sarr tried to run over her with the truck, she did not agree with Mr. Bryan's perception of the event and, in fact, minimized the incident. When gaps appeared in her memory, she forthrightly admitted to them. She only testified to what she could remember and qualified her answers when she thought she might remember wrongly.

[¶ 35] The tape discloses a woman who came into the sheriff's department reluctantly to make incriminating statements against the man she loved all the while taking every opportunity to insure that her statements were truthful and accurate. Her quest for honesty pervades the tape through both her manner in giving her account and in her tone of voice. For these reasons we deem the tape trustworthy.

*The Claimed Insufficiency of the Evidence*

[¶ 36] Before a conviction can stand, the evidence must satisfy all of the elements of

the crime charged beyond a reasonable doubt. Sarr argues insufficiency of the evidence as to all counts. We agree as to Counts III and IV but as to the remaining counts we find sufficient evidence.

[¶ 37] In Counts III and IV the State was obligated to prove beyond a reasonable doubt that Sarr's conduct caused "serious bodily injury." The following definition applies: " 'Serious bodily injury' means bodily injury which creates a substantial risk of death or which causes miscarriage, severe disfigurement or protracted loss or impairment of the function of any bodily member or organ[.]" Wyo. Stat. Ann. § 6–1–104(a)(x) (LexisNexis 2001).

[¶ 38] Because we have determined that Ms. Wing's statement regarding her spinal injury and MRI results was not admissible under W.R.E. 804(b)(6), proof of serious bodily injury is wanting as to Count III. As to Count IV we have carefully reviewed the record and find no evidence of serious bodily injury as defined by statute.

[¶ 39] We do not condone the conduct alleged in Counts III and IV. Nor do we believe that the beatings did not cause injury. But the demands of the statute defining serious bodily injury are clear and explicit.

[¶ 40] As to Counts I, V, and VI, ample evidence was presented to support findings of guilt. But as to these counts, Sarr presents additional argument. He asserts that because the instruction allowed a conviction for conduct determined to be "intentional, knowingly or recklessly," the verdict must be set aside. Sarr claims that an instruction in the alternative is improper. Because the evidence is sufficient to support any one of the alternatives, we find no error. *See, May v. State,* 2003 WY 14, 62 P.3d 574 (Wyo.2003).

*The Restitution Order*

[¶ 41] The restitution order is based in part upon damages resulting from the allegations of Counts III and IV. These counts have been set aside. The order of restitution

relied upon the validity of those convictions, so it too must be set aside.

*The Right to a Speedy Trial pursuant to W.R.Cr.P. 48*

[¶ 42] In his final issue, Sarr claims that his right to a speedy trial was violated. At the time of his arraignment on April 16, 2001, W.R.Cr.P. 48 [3] provided in relevant part:

(b) Speedy Trial.

(1) It is the responsibility of the court, counsel and the defendant to insure that the defendant is timely tried.

(2) A criminal charge shall be brought to trial within 120 days following arraignment unless continued as provided in this rule.

* * *

(4) Continuances not to exceed six months from the date of arraignment many be granted by the trial court as follows:

(A) On motion of defendant supported by affidavit; or

(B) On motion of the attorney for the state or the court if:

(i) The defendant expressly consents;

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced * * *[.]

[¶ 43] Sarr initially was scheduled for trial on August 13, 2001, 119 days after his arraignment and within the 120–day standard set by Rule 48. The prosecution moved for a continuance of the trial date because of a conflict with oral arguments before this Court on another case. Sarr did not object to the motion and the district court granted continuance. Sarr's trial commenced on October 11, 2001, 178 days after his arraignment.

[¶ 44] On appeal, Sarr insists his right to a speedy trial was violated when the 120–day limit of Rule 48 was exceeded, and, accord-

**3.** Rule 48 was amended effective September 1, 2001.

ingly, the charges against him should have been dismissed without prejudice. In an alternative argument, Sarr also contends the charges against him should have been dismissed pursuant to the factors set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Those factors are: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Taylor v. State*, 2001 WY 13, ¶ 5, 17 P.3d 715, 718, ¶ 5 (Wyo.2001).

[¶ 45] The delay occasioned by the State's requested continuance arguably fits within the exception for the due administration of justice in W.R.Cr.P. 48(b)(4)(B)(iii). The basis for the continuance was conflict between the trial date in this case and an oral argument in another case before this Court. Sarr presents no cogent argument for why the delay occasioned by the continuance should be excluded from the calculation of the time between his arraignment and trial. Furthermore, Sarr never made a written demand or otherwise vigorously asserted his right to a speedy trial under W.R.Cr.P. 48. Accordingly, we find no speedy trial violation under Rule 48 since exclusion of the delay caused by the continuance would bring his trial within 120 days of Sarr's arraignment.

[¶ 46] Application of the *Barker* factors does not advance Sarr's claim either. Assuming the first two factors weigh in favor of Sarr, the latter two weigh against such a finding. Sarr gave no indication during the proceedings below that would suggest an assertion of his right to a speedy trial. The complete failure to assert his speedy trial right weighs significantly against finding a violation. *Campbell v. State*, 999 P.2d 649, 656 (Wyo.2000). He has also failed to show any prejudice arising out of the delay. In his brief, Sarr claims prejudice through his pre-trial incarceration. Sarr makes no cogent argument establishing prejudice beyond the mere citation to his confinement. At least some portion of Sarr's pretrial confinement was, however, due to a conviction on another crime. In short, Sarr comes far short of making the necessary showing to establish a violation of his right to a speedy trial.

## CONCLUSION

[¶ 47] Count III of the judgment of conviction is reversed and remanded. As to Count IV, the judgment of conviction is reversed but for reasons of double jeopardy cannot be re-tried. As to Counts I, V, and VI, the judgment of conviction is affirmed. As to the judgment of restitution, it is reversed and remanded.